**In re HANDY ANDY HOME IMPROVE-MENT CENTERS, INC., Debtor.**

**Bankruptcy No. 96 B 21655.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 22, 1996.

John Collen, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Debtor.

Michael Weininger and Rusty Payton, Katz, Randall & Weinberg, Chicago, IL, for National Terminals Corp.

### MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This case presents the question of whether under Bankruptcy Code § 365(d)(3), 11 U.S.C. § 365(d)(3), a debtor must timely pay real estate taxes which accrued pre-petition but were billed during the pre-rejection, post-petition period. This matter is before the Court on the Amended Motion and Supplemental Motion of the landlord National Terminals Corporation ("National") to compel Handy Andy Home Improvement Centers, Inc. ("Handy Andy" or "Debtor") to comply with § 365(d)(3). The parties have stipulated as to the facts, waived the filing of an adversary complaint, and rested.

On or about July 31, 1986, Handy Andy, as lessee, and North Pier Terminal Co., predecessor in interest to National, as lessor, entered into a commercial lease ("Lease") for certain nonresidential real property and improvements located at 2300 Maywood Drive, Bellwood, Illinois (the "Property"). The Lease term was from October 1, 1986 through September 30, 1996. An order was entered approving the rejection of this lease on April 17, 1996.[1]

On October 12, 1995, an involuntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. *§ 101 et seq.,* was filed against Handy Andy. On November 1, 1995, Handy Andy consented to the entry of an order for relief and became the debtor in possession. Handy Andy continues to operate its business and conduct its financial affairs as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

Pursuant to the Lease, Handy Andy is obligated to pay "base rent" as well as "additional rent." Base rent is a fixed monthly rental of $1.85 per square foot, or $36,075.00 monthly, until termination of the Lease on September 30, 1996. The Lease requires Handy Andy to pay, as additional rent, real estate taxes, certain assessments, and all utilities. It was National's practice to pay the taxes and provide Handy Andy with copies of the real estate tax bills received, together with an invoice for reimbursement to National.

The Lease obligates Handy Andy to make monthly deposits of $\frac{1}{12}$ the real estate taxes assessed and levied into a "Tax Account." Pre-petition, Handy Andy utilized this account solely to reimburse National or to contest tax assessments. The balance in the Tax Account as of November 1, 1995 was $235,050.99. The lease requires monthly deposits of $24,738.59 to that account. Under the Lease the Tax Account should total $123,692.95 as of March 31, 1996. Handy

---

1. The Lease was rejected after both sides rested on the stipulation of facts.

Andy has agreed to deposit additional funds to bring the account current.

The Lease does not require that an escrow be established nor does one exist. National is not a signatory on the account. Handy Andy, the sole signatory, is the sole source of all of the monies deposited in the Tax Account. Under ¶ 5(b) of the Lease, Handy Andy is entitled to all interest earned on the monies deposited in the Tax Account.

National argues that Handy Andy has failed to comply with § 365(d)(3) by failing to satisfy its post-petition obligations to National pursuant to the Lease. National alleges that Handy Andy has paid its "base rent", but has failed to pay "additional rent" in the form of real estate taxes which were due under the Lease on November 1, 1995[2] and March 1, 1996.

## I. JURISDICTION

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 by reference from the United States District Court for the Northern District of Illinois under General Rule 2.33(A). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (M).

## II. DISCUSSION

### A. Real Estate Taxes

In Illinois, real property taxes are assessed on a calendar year basis but are not billed until the following year. 35 ILCS 200/1–155; 35 ILCS 200/21–30.[3] Taxes are generally billed in two installments. 35 ILCS 200/20–210. The due dates for the installments vary depending on the size of the county and the method of accelerated billing. *See, e.g.*, 35 ILCS 200/21–15; 35 ILCS 200/21–20; 35 ILCS 200/21–25. Generally, in January, an estimated tax bill setting out half of the expected taxes is mailed to the property owner. 35 ILCS 200/21–30. Then, by the end of June, an actual tax bill is distributed. *Id.* This bill sets out the total taxes due, the amount of estimated taxes billed in the first installment, and the balance of taxes due for that year. *Id.* The tax bills at issue were issued by the taxing authority to the owner post-petition, with due dates of November 1, 1995 and March 1, 1996. The November 1 tax bill was the final bill for the second installment of 1994 real estate taxes which had been assessed against the property. The March 1 tax bill was for the estimated first installment of 1995 real estate taxes assessed against the property. National issued invoices to Handy Andy for these bills on or about October 23, 1995, and February 27, 1996, and paid these bills to the taxing authority on or about October 24, 1995, and February 28, 1996, respectively.

### B. The Lease

The Lease provides that Handy Andy will pay all "real estate taxes and assessments, water rates, utilities and all other ordinary and extraordinary impositions ... accruing during the term of this Lease." Lease ¶ 5(a).[4] Under the terms of this lease, Na-

---

2. According to the tax bill, these taxes were due to the taxing authority on November 3, 1995.

3. All references to ILCS are to Illinois Consolidated Statutes, State Bar Edition, (1994).

4. 5. *Taxes, Assessments and Utilities:*

(a) As additional rent for the demised premises, Lessee agrees to pay all general and special real estate taxes and assessments, water rates, utilities and all other ordinary and extraordinary impositions, ... accruing during the term of this lease and any extension thereof.

(b) Lessee shall deposit monthly, in an interest-bearing account reasonably acceptable to Lessor (with all interest to be for the benefit of Lessee) (the "Tax Account") a sum equal to one twelfth (1/12) of the annual general real estate taxes levied and assessed against the demised premises so that Lessee shall always have on deposit in the Tax Account sums equal to the accrued real estate taxes levied and assessed. It is understood that Lessee will be responsible for all taxes accrued during the term hereof upon termination of this Lease and will pay the amounts that may be due on re-proration when the actual amounts are ascertained.

(c) ....

(d) Lessor shall deliver to Lessee a bona fide bill for real estate taxes, directly levied against the demised premised and issued by the applicable taxing authority, at least thirty (30) days prior to when payment is due or within ten (10) days after said bill is received by Lessor, whichever date is earlier. Lessee shall pay, out of the Tax Account (to the extent funds therein are sufficient) such taxes directly to the taxing authority on the later of (i) ten (10) days before the date on which such taxes are due, or (ii) twenty (20) days after lessee's receipt of said bill ...

tional is required to deliver to Handy Andy a "bona fide bill" for real estate taxes levied against the property and issued by the taxing authority thirty days before payment is due or within ten days of National's receipt of the bill. Lease at ¶ 5(d). Handy Andy is then required to pay the taxing authority directly from the Tax Account either ten days before the taxes are due or twenty days after Handy Andy receives the tax bill or statement. *Id.* If not paid, the Lease gives National the option to pay the taxes itself, and add that amount as additional rent due on the next rent day. Lease at ¶ 5(d).[5]

The Lease is what is commonly known as a triple-net lease. In such a lease, the "rent" is net to the landlord because the tenant pays taxes and other expenses. This ensures that the landlord will receive profits from the lease. "Net leases separate pure rent from costs of operation such as real estate taxes and expenses ... and requires tenant to pay its share ... as additional rent." Raymond J. Werner and Robert Kratovil, *Real Estate Law,* § 47.03, at 632 (10th Ed.1993).

■ Such a lease generally involves some form of base rent. Then, in order to accommodate increases in market rentals over time and to reflect general changes in the value of the dollar, base rent generally includes some method by which it increases each year. Landlords also include provisions to protect their operating costs against inflation. This includes requiring the tenant to pay maintenance, insurance, property taxes and common area charges. In Illinois, the owner of land, who is the one obligated to pay all real estate taxes, can shift the burden to the lessee only if there is clear agreement to that effect. *City of Chicago v. Chicago City Bank & Trust Co.,* 129 Ill.App.3d 410, 415, 84 Ill.Dec. 690, 694, 472 N.E.2d 827, 831 (1984); *see also Ceres Terminals, Inc. v. Chicago City Bank and Trust Co.,* 259 Ill. App.3d 836, 864, 200 Ill.Dec. 146, 154, 635 N.E.2d 485, 504, *appeal denied,* 157 Ill.2d 496, 205 Ill.Dec. 158, 642 N.E.2d 1275 (1994).

Although the owner of property can fully and effectively shift the burden of real estate tax to its tenant, the owner remains primarily liable to the taxing authority. *See* 35 ILCS 200/9–175 ("The owner of property on January 1 in any year shall be liable for the taxes of that year."). In addition, unpaid taxes become a lien on the property as of January 1 of the year in which the taxes are levied. 35 ILCS 200/21–75. Thus, a landlord would be able to enforce a lease provision providing for payment of real estate taxes against a lessee, however the taxing authority would not. *See, e.g., Village Supermarkets, Inc. v. West Orange Tp.,* 206 N.J.Super. 597, 602, 503 A.2d 370, 373 (App. Div.), *cert. granted,* 104 N.J. 426, 517 A.2d 421 (1986), *aff'd as modified on other grounds,* 106 N.J. 628, 525 A.2d 323 (1987). The tenant's liability arises only under the lease and therefore runs only in favor of the landlord. A tenant such as Handy Andy has no direct obligation to the taxing authority. In this case, the Lease provides that Handy Andy will pay "all general and special real estate taxes and assessments, water rates, utilities and all other ordinary and extraordinary impositions ... directly to the taxing authority." Lease ¶ 5(a) & (d). Even though Handy Andy is obligated to National to pay the tax bills, the primary liability to the taxing authority remains with National.

National argues that Handy Andy has failed to comply with this § 365(d)(3) postpetition lease obligation by failing to reimburse National for real estate taxes. Handy Andy argues that its obligation to reimburse National for real estate taxes arose largely pre-petition when the taxes accrued against National. Thus, Handy Andy argues that National seeks an "improper demand for payment of *prepetition* tax obligations" which is unwarranted by § 365(d)(3) and prohibited by the bankruptcy code. (emphasis in original). National argues that Handy Andy was not obligated to pay real estate taxes to National until November 1, 1995; thus, reim-

---

(e) Lessor shall, at its option, have the right at all times ... to pay any such taxes ... not paid by Lessee or deposited in the Tax Account, and the amounts so paid, ... shall be so much additional rent due at the next rent day after any such payments, with interest at the rate of ten percent (10%) per annum from the date of payment hereof.

5. The actual practice between the parties differed, as described supra, pp. 89–90.

bursement of the real estate taxes was a "post-petition obligation which Handy Andy is compelled to perform pursuant to § 365(d)(3) of the Code."

### 1. The Tax Account

 National also argues that the funds in the Tax Account which Handy Andy was required to maintain under the terms of the lease are actually held in a segregated account for National's benefit. National argues that under § 541 these funds are not property of the estate. "Handy Andy is no more than a trustee with legal title only." National Amended Motion ¶ 25. National further argues that this account is a resulting trust. National is mistaken. Pursuant to § 541, the funds in the Tax Account are property of the estate. *See* 11 U.S.C. § 541(a)(1) & 11 U.S.C. § 541(d).

In order for National to prevail on this argument, it would have to establish that Handy Andy was somehow limited in its access to the Tax Account funds. An escrow account, limiting Handy Andy's right to withdraw or use the funds, might arguable not be property of the estate. The only defining terms under the Lease, however, are that "Lessee shall always have on deposit in the Tax Account sums equal to the accrued real estate taxes levied and assessed." The funds in the account could have been commingled with others and could have been disbursed by Handy Andy for any purpose. The Tax Account only gave National some assurance that Handy Andy had sufficient funds available to make tax payments as required.

Under Illinois law, "an escrow is traditionally a written instrument whereby property of the obligor is held by escrowee until the performance of a condition or happening of an event after which the property is then turned over to the obligee." *Hoornstra v. United States*, 969 F.2d 530, 533 (7th Cir. 1992); *see also Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 272 Ill.App.3d 370, 208 Ill.Dec. 455, 463, 649 N.E.2d 511, 519 (1995). An escrow account is defined as "a bank account generally held in the name of the depositor and an escrow agent which is returnable to depositor or paid to third person on the fulfillment of escrow condition."

Black's Law Dictionary, 6th Edition. No such escrow account exists.

A resulting trust is created by operation of law but has its roots planted in the party's intentions. *In re Wilson's Estate*, 81 Ill.2d 349, 355, 43 Ill.Dec. 23, 26, 410 N.E.2d 23, 26 (1980); *see also In re Waner Corp.*, 146 B.R. 973, 977 (Bankr.N.D.Ill.1992); *Midwest*, 272 Ill.App.3d 370, 208 Ill.Dec. at 463, 649 N.E.2d at 519. There are three general situations where a resulting trust arises: "when an express trust fails; when an express trust is fully performed but the trust estate has not been exhausted; and when one party pays for property and directs the vendor to convey it to another." *Midwest*, 272 Ill.App.3d 370, 208 Ill.Dec. at 463, 649 N.E.2d at 519. The burden of proof is upon the party seeking to establish a resulting trust, and the evidence must be clear, convincing and unmistakable. *Waner*, 146 B.R. at 977; *Wilson's*, 81 Ill.2d at 356, 43 Ill.Dec. at 27, 410 N.E.2d at 27. National has not offered evidence to support its theory that a resulting trust has arisen with regards to the Tax Account. In fact, the Lease, itself, belies this theory. The Lease does not restrict the funds Handy Andy can deposit in the Tax Account. Handy Andy was not even required to maintain a separate account for tax deposits. The only requirement was that Handy Andy make monthly deposits into an "interest-bearing account." Equity does not require the imposition of a trust. The Tax Account is not a resulting trust in favor of National; rather, it is a general deposit account. *See Sears v. First Fed. Sav. and Loan Ass'n of Chicago*, 1 Ill.App.3d 621, 631–32, 275 N.E.2d 300, 306–07 (1971) (use by mortgagor of borrower's tax and insurance accounts did not give rise to trust relationships).

### 2. Terms of the Lease

██ Section 365(d)(3) provides: "[t]he trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected...." 11 U.S.C. § 365(d)(3). Thus, seemingly, several conditions are required in order to trigger the application of Section 365(d)(3).

Timely performance is required for (a) "obligations" of the debtor which (b) "arise from and after" the order for relief, (c) via a lease of non-residential real property, and (d) only until the lease is assumed or rejected.

 If the lease is ultimately assumed under § 365(a), then the debtor will have to cure both pre-and post-petition defaults under § 365(b). Here, the lease has been rejected. The debtor refused to make the payments for the interim period.

 Section 365(d)(3) does not address tax payments directly, nor does it define which obligations are considered to arise after the order for relief. Since those obligations arise solely from the Lease, we must first look to the language of the Lease to determine the intent of the parties, which intent governs under basic contract law. A lease is a contract, and a complete and unambiguous written contract is presumed to include all material terms, so that evidence of circumstances, state of mind or other parol evidence is inadmissible at trial to contradict a contract's clear terms. *In re Greenfield Direct Response, Inc.,* 171 B.R. 848, 856 (Bankr.N.D.Ill.1994) (citations omitted). When the language of a contract is objectively ambiguous, we look to other evidence to determine the intent of the parties. *AM International, Inc. v. Graphic Management Associates, Inc.,* 44 F.3d 572, 575 (7th Cir. 1995). A court's primary objective in construing a contract is to give effect to party intent. *Home Ins. Co. v. Chicago and Northwestern Trans. Co.,* 56 F.3d 763, 767 (7th Cir.1995) (citations omitted). Here, the parties have rested so all the evidence is before the Court.

The Lease provides that Handy Andy will pay all real estate taxes accruing during the term of the Lease, but that the actual time for payment is after the bills are issued. What then was the intent of Lessor and Lessee? In order to determine the intent, we look further into the contingencies covered by the Lease. What does the Lease provide in the event of a contingency which would disrupt the relationship between the parties, i.e., fire and destruction of the premises?

Paragraph 11 of the Lease reflects that if a fire should render the entire premises uninhabitable, then upon the election of either party, base rent and additional rent are prorated to the date of the incident. If the premises are to be restored or repaired and the tenant cannot operate in the interim, then only base rent is abated. Moreover, the Lease provides for real estate taxes to be prorated "as of the date of commencement of possession in the year 1986 and as of the date of expiration for the last year of the term of this Lease on the basis of the then last available tax bills, and to be reprorated when the final tax bill is issued." Lease ¶ 5(a). The Lease specifically provides that Handy Andy "will be responsible for all taxes accrued during the term hereof upon termination of this Lease and will pay the amounts that may be due on re-proration when the actual amounts are ascertained." Lease at ¶ 5(b).

The Lease, by its terms, imposes a duty on the Lessee to pay taxes from the day of commencement of possession through termination. The liability does not arise from the date of issuance of the tax bill but rather on a daily basis throughout the lease term. The Lease therefore establishes a proration for the commencement of possession and for accrual which ends upon lawful termination of the Lease.

Under this Lease, does the obligation arise after the order for relief as required by § 365(d)(3)? At the time when the parties entered into the Lease, the landlord made a conscious decision to become a creditor of the lessee. Base rent is prepaid on a monthly basis; real estate taxes are not. The parties could have drafted the Lease to required monthly payments of $\frac{1}{12}$ the taxes to the landlord or to a joint direction account; they did not do so. Rather, the Lease established a debt that accrued from the first day of the Lease period. By electing to require payment at a later date, the landlord essentially extended credit to the lessee. That debt arose pre-petition and is no different from unpaid, pre-petition base rent.

## C. The 1984 Bankruptcy Amendments

 Statutory interpretation is best characterized as a question of law. If a

statute is plain and unambiguous on its face, "judicial inquiry is complete." *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted); *Matter of Sinclair,* 870 F.2d 1340, 1341 (7th Cir.1989) (collecting cases). It is well established that the primary goal of statutory construction is to ascertain and effectuate the legislature's intent. *Matter of Barker,* 768 F.2d 191, 194 (7th Cir.1985). A court construing a statute should first look to the language of the statute. If the language is clear and unambiguous, the court should look no further. *Id.* at 194–95. Moreover, the Supreme Court has held that except in rare cases in which literal application of the Bankruptcy Code would be demonstrably at odds with the intention of the drafters, the "plain meaning of legislation should be conclusive." *In re Luria Steel and Trading Corp.,* 189 B.R. 418, 423 (N.D.Ill. 1995) (citing *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989)).

Section 365(d)(3), enacted as part of the Bankruptcy Reform Act of 1984, does not define exactly what expenses are obligations required to be timely performed. While courts generally agree that the term "obligation" requires timely performance of rent and common area and other charges, they are decidedly split as to the relationship between an "obligation" and a "claim." Certain "obligations" such as taxes and maintenance, while billed post-petition under the terms of the lease, may arguably relate to a pre-petition period. Courts disagree as to whether these charges arise from and after the order for relief and whether the term "obligation" is the equivalent of the term "claim." This Court must look to the law as it existed prior to the 1984 bankruptcy amendments to determine what changes were intended to be enacted.

Prior to the enactment of § 365(d)(3), such lease obligations were handled under § 503, the general section for administrative expenses. *In re Child World, Inc.,* 161 B.R. 571, 574 (S.D.N.Y.1993). The court would determine whether the Lease terms were reasonable in light of the market and allow, as an administrative expense, such lease obligations that related to the interim period only. "[W]hen the lease required the debtor-tenant to reimburse the landlord for real estate taxes, as in the instant case, the courts would only allow as an administrative expense real estate taxes accruing during the post-petition, pre-rejection period, regardless of when they were billed." *Id.* at 575 (collecting cases).

Section 365(d)(3) was enacted as part of the 1984 bankruptcy amendments but was enacted with little legislative history. "No Senate report or House report was submitted with the legislation, nor did the House conference report contain a joint explanatory statement. All we find in the Congressional Record are statements by legislators. Senator Hatch was apparently the only legislator to address what would become § 365(d)(3)." *Id.,* at 575, n. 6.[6]

> [T]he landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease.

H.R.Rep. No. 882, 95th Cong., 2d Sess.1984, reprinted in 1984 U.S.C.C.A.N. 576.

Is National the involuntary creditor which Congress sought to protect?

▮▮▮ With the exception of imposing current payment for current services, neither the language of the statute nor the legislative history suggests Congress intended to deviate from pre-amendment practices. As stated, the standard practice prior to the 1984 bankruptcy amendments was to pro-rate lease obligations pending rejection.

---

**6.** All the cases discuss Senator Hatch's comments as the sole historical record. The cases on both sides use the language in the legislative history. No additional in depth discussion is needed here.

When Congress amends the bankruptcy laws, it does not write on a clean slate ... Furthermore, [the Supreme Court] has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*In re Klein Sleep Products, Inc.*, 78 F.3d 18, 27 (2nd Cir.1996) (quoting *Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992)); see also *Child World*, 161 B.R. at 575–76. Section 365(d)(3) is a means of alleviating the burdens caused by a debtor tenant pending assumption or rejection of a commercial lease. It is not a means of giving all landlords a "superpriority" for all of debtor-lessee's defaults.

 "The purpose of § 365(d)(3) is to prevent landlords from becoming involuntary post-petition creditor's of the bankruptcy estate. A landlord cannot be required to provide post-petition services without current payments for those services. The payment of pre-petition taxes does not serve that purpose." *In re Warehouse Club, Inc.*, 184 B.R. 316, 317 (Bankr.N.D.Ill.1995).

 The Bankruptcy Code classifies several different types of creditors. There are general, pre-petition creditors. These creditors hold claims which arose prior to the date of filing the petition and are paid pro-rata along with all other general unsecured, pre-petition creditors. There are post-petition creditors who choose to do business with the debtor-in-possession and extend credit or perform services after the filing date of the bankruptcy petition. Such creditors receive an administrative expense priority under § 364 and § 503 in exchange for doing business with the trustee or debtor-in-possession. In an involuntary case there are also "gap" creditors. *See* 11 U.S.C. § 502(f). These creditors do business with, or extend credit to the debtor post-petition prior to the entry of the order for relief. Gap creditors are prioritized immediately below administrative claimants. 11 U.S.C. § 507(a)(2). Landlords

are a uniquely situated class of creditors. A landlord, obligated under a pre-petition lease until rejection or assumption, is forced to continue its relationship with the debtor until the lease is rejected or assumed. Post-petition suppliers may choose to demand C.O.D. terms or may sell on normal business credit terms. Those who sell on credit receive administrative claim treatment. Landlords are the exception. Congress, via § 365(d)(3), has sought to equalize their position. Section 365(d)(3) requires timely payment for current services so as to put the landlord into the position of a post-petition supplier who demands a cash payment. However, just as a supplier cannot coerce payment of the pre-petition claim, so too the landlord is placed into the position of receiving timely payment only for current obligations.[7] To imply more is to go beyond the plain language of the 1984 Amendments. Congress will only alter its well-established priority scheme when it does so explicitly. *In re Ionosphere Clubs, Inc.*, 22 F.3d 403, 408 (2nd Cir.1994).

 National argues that the debt is post-petition since the tax reimbursement date was post-petition. A demand note is not a post-petition debt just because the demand is made post-petition. A debt which matures post-petition is still a pre-petition debt. Handy Andy's lease obligations should be treated similarly.

### D. Case Law Interpreting Section 365(d)(3)

The majority of courts which have considered the question have held that real estate taxes which accrue pre-petition but are not billed under a lease until post-petition are not obligations which must be timely complied with under § 365(d)(3). "The legislative history makes clear that Congress did not intend for courts applying § 365(d)(3) to rely mechanically on the billing date in determining which postpetition, prerejection obligations under nonresidential leases must be timely paid." *Child World*, 161 B.R. at 577; see also *In re Almac's, Inc.*, 167 B.R. 4, 8 (Bankr.D.R.I.1994). It is a substantial ma-

---

7. Interestingly, under § 365(d)(3) timely payments only commence from the date of the order for relief. Rentals during the GAP period remain unchanged.

jority which have joined together and have held that "rent should be prorated to cover only the postpetition, prerejection period, regardless of the fortuity of the billing date." *Id.* (collecting cases). *See Warehouse Club,* 184 B.R. 316 (debtor's contractual obligation to pay taxes did not originate, or arise, when bill came, but when taxes accrued); *In re All for A Dollar, Inc.,* 174 B.R. 358, 361–62 (Bankr.D.Mass.1994) (pro-rating a debtors obligations under a lease, regardless of the billing date, is the closest relation to the priority scheme of the bankruptcy code); *In re Ames Dept. Stores, Inc.,* 136 B.R. 353, 356 (Bankr.S.D.N.Y.1992) (date of reimbursement request is not controlling); *In re Revco D.S., Inc.,* 111 B.R. 626 (Bankr.N.D.Ohio 1989) (only pro-rated percentage rent accruing from petition date to end of lease year is post-petition expense even though "due date" was post-petition); *Matter of Swanton Corp.,* 58 B.R. 474 (Bankr.S.D.N.Y.1986) (equity requires proration where rejected leased provided for single annual payment of rent and rejections were only a few months into annual period); *In re William Schneider, Inc.,* 175 B.R. 769, 771 (S.D.Fla.1994) ("The existence of the debt is not the same as an agreed date for payment of the debt.").

However, it must be noted that a growing minority of courts have held that as the taxes come due to the landlord post-petition, they require timely payment under the Bankruptcy Code. *In re Krystal Co.,* 194 B.R. 161, 162 (Bankr.E.D.Tenn.1996); *In re R.H. Macy,* 152 B.R. 869, 873 (Bankr.S.D.N.Y. 1993). The *Macy* court stated that, unlike with a unmatured or contingent claim, the debtor is under no obligation until the debtor is billed by the landlord. Thus, real estate taxes billed subsequent to the filing of the bankruptcy petition would be a post-petition expense. *Id.; see also In re Duckwall–ALCO Stores, Inc.,* 150 B.R. 965, 976 (D.Kan. 1993) (debtor obligated to pay entire tax bill which covered half of previous year because it was billed post-petition but pre-rejection); *In re F & M Distributors, Inc.,* No. 94–52115–S, slip op. at 8 (Bankr.E.D.MI. May 4, 1995) (unpublished decision) (debtor-tenant's tax obligation did not 'arise' pre-petition because there was no obligation to pay prior to petition date).

The bankruptcy court in *In re Child World.,* 150 B.R. 328 (Bankr.S.D.N.Y.), *rev'd,* 161 B.R. 571 (S.D.N.Y.1993), held that the full amount of taxes due on the post-petition "lease" date must be paid under § 365(d)(3). The court said that the real estate taxes paid for by the landlord were not a tax claim. Rather, they were an integral component of the debtor's rent obligation under the lease, and must be paid pursuant to § 365(d)(3). *Id.* at 331–32. The district court, in reversing, returned to the language of the statute and determined that pre-petition real estate taxes due post-petition under a triple-net lease, are not obligations to be timely paid pursuant to § 365(d)(3). *Child World,* 161 B.R. at 574.

■ Under the language of this Lease, this Court joins with the majority of courts which hold, in cases where leases contain similar provisions, with no further evidence as to intent, a debtor's tax obligations which arise pre-petition, but are billed post-petition, are not obligations which the debtor is compelled to timely perform under § 365(d)(3). However, "[i]t still bears emphasizing that, in cases involving postpetition tax bills, even a court favoring the proration theory should, depending on the language in the lease, sometimes reach the same result—payment of a postpetition tax bill in full—as a court adopting the billing date theory." Joshua Fruchter, *To Bind or Not to Bind—Bankruptcy Code § 365(d)(3): Statutory Minefield,* 68 Am.Bankr.L.J. 437, 471 (1994).

As stated, the lease has been rejected and National has exercised its option under the Lease to pay the taxes directly to the taxing authority. Handy Andy is therefore obligated under § 365(d)(3) to pay National real estate taxes which accrued from November 1, 1995, the date of the entry of the order for relief, through April 17, 1996, the date of rejection of the Lease.

### III. CONCLUSION

This Court holds that under the terms of this Lease, Handy Andy is only obligated under § 365(d)(3) to timely pay the prorated portion of post-petition, pre-rejection real estate taxes which were assessed against the

property, but not those which accrued pre-petition, i.e., taxes for the period through October 31, 1995.