2016 IL App (1st) 151659

FOURTH DIVISION
November 17, 2016

No. 1-15-1659

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, individually and a/s/o Countryside Association for People with Disabilities, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 14 CH 9166 |
| PACE SUBURBAN BUS SERVICE, a Division of the Regional Transportation Authority, | ) ) ) | Honorable Diane J. Larsen, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Ellis and Justice Howse concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, Philadelphia Indemnity Insurance Company (Philadelphia), filed a four count declaratory judgment complaint against defendant, Pace Suburban Bus Service (Pace), in the circuit court with claims of equitable subrogation, equitable contribution, unjust enrichment, and "Assignment from Countryside of all rights against Pace" relating to a $1.5 million settlement it paid on behalf of Countryside Association for People with Disabilities (Countryside) to Lisa Gomez, who had been injured while in Countryside's care. Philadelphia claimed that it should be reimbursed by Pace, in whole or in part, for that settlement, which it had paid after Gomez had communicated a pre-suit settlement demand to Philadelphia. Pace moved to dismiss Philadelphia's complaint pursuant to section 2-619 of the Code of Civil Procedure (Code). 735 ILCS 5/2-619 (West 2012). The circuit court granted that motion, and Philadelphia now appeals.

¶ 2    The record shows that Pace, a division of the Regional Transportation Authority, entered into an agreement with Countryside, entitled "Pace Advantage Vehicle Program Agreement" (the leasing agreement) in 2010. Under the leasing agreement, Pace agreed to furnish a vehicle to Countryside to transport individuals with disabilities to and from the Countryside facility in exchange for $365 per month per vehicle. The leasing agreement further specified that Pace would provide the vehicle and Countryside was responsible for providing its own drivers. Pace vehicles utilized pursuant to the leasing agreement would be included in Pace's "Risk Financing Program," which:

> "shall provide commercial auto liability coverage to [Countryside] for any claims of bodily injury, death, or property damage arising directly out of the provision of Transportation Services provided with Pace vehicles as described in this agreement, within the scope of Pace's Self-Insured Retention and up to the liability limits of such excess insurance that Pace may purchase, *subject to the following terms, conditions, and exclusions*:
>
> > (a) Pace specifically excludes from insurance coverage afforded to [Countryside] herein any claims, actions, damages arising as the result of willful and wanton, reckless, or intentional conduct of [Countryside], its officers, agents, employees, contractors, sub-contractors, agents, or volunteers." (emphasis in original).

¶ 3    The leasing agreement further provided that:

"The policies of excess insurance purchased by Pace and Pace's

Self-Insured Retention shall be primary over insurance carried by

[Countryside] for claims within the scope of Pace's Risk Financing

Program. Any insurance or self-insurance maintained by

[Countryside] shall be in excess of Pace's Self Insured Retention

and the policies of excess insurance purchased by Pace, without

right of contribution, for claims within the scope of Pace's Risk

Financing Program."

¶ 4       Countryside obtained additional automobile liability coverage from Philadelphia, which provided that it would:

"pay all sums an 'insured' legally must pay as damages because of

'bodily injury' or 'property damage' to which this insurance

applies, caused by an 'accident' and resulting from the ownership,

maintenance or use of a covered 'auto.' "

¶ 5       Philadelphia described the following descriptions of "Covered Auto[s]" in its policy. "Owned 'Autos' Only" were described as, "Only those 'autos' you own *** includ[ing] those 'autos' you acquire ownership of after the policy begins." "Hired 'Autos' Only" were described as, "Only those 'autos' you lease, hire, rent or borrow." Finally, "Non-owned 'Autos' Only" were described as, "Only those 'autos' you do not own, lease, hire, rent or borrow that are used in connection with your business."

¶ 6       The Philadelphia policy further provided that:

"For any covered 'auto' you own, this coverage form provides

primary insurance. For any covered 'auto' you don't own, the

3

insurance provided by this coverage form is excess over any other

collectible insurance."

¶ 7      The following facts regarding the underlying incident come from the September 6, 2013, pre-suit settlement demand letter of Lisa Gomez and her draft complaint, which were attached to Philadelphia's complaint. On the morning of July 10, 2013, Robert Gottardo, a Countryside employee, drove a Pace van to pick up and transport Countryside clients to the facility for daily services. Lisa Gomez, a 42 year-old woman who suffers from an intellectual disability and who "functions at the level of a five year-old child," was picked up from her home in Schaumburg around 7:30 a.m. Upon arriving at the Countryside facility at approximately 8:30 a.m., Gottardo rolled up the windows, exited the vehicle and placed a sign in the van window reading "Vehicle Checked, Vehicle Empty" while Gomez remained strapped into her seat inside. Gottardo entered the facility and informed other Countryside employees that Gomez was a "no-show" that day. Gottardo then left the Countryside lot in his personal vehicle. Gomez was left unattended in the vehicle for more than five hours, during that time the temperature outside the van reached 90 degrees.

¶ 8      At approximately 1:50 p.m., Gottardo returned to the van. He later admitted to another Countryside employee that he saw Gomez in the back of the van at that time, but he decided not to tell anyone at Countryside that he had abandoned her in the van all day. Gottardo did not check on Gomez at that time, and instead began to drive his normal route. Gottardo arrived at Gomez's home at approximately 2:45 p.m., at which time Gomez was having a heat-induced seizure. Gomez's mother recognized that Gomez was having a seizure, and yelled to Gottardo to call 9-1-1. Gottardo left the scene before emergency personnel arrived. Gomez was unconscious when the Schaumburg Fire Department and paramedics arrived. It was determined that she had

suffered numerous medical conditions, including a heart attack, septic shock, gastrointestinal hemorrhage, and infections caused in part by exposure to urine and feces soaked clothing.

¶ 9    The record further contains an incident report and account from Kim Nygaard, a Countryside employee. In the incident report, Nygaard described the "Type of Incident" as one of "egregious neglect." In her account, Nygaard explained that around 3:55 p.m., she was contacted by a case worker, "Lori," who told her that a parent had called to express concern that an ambulance "had to come to the bus because a girl was having a seizure." Nygaard stated that, at that point, Countryside was unaware of any issue involving Gomez. About 10 minutes later, Gottardo returned to Countryside and was asked by staff member Maggie Kukielka about the parent's complaint. Gottardo admitted that he had abandoned Gomez in the van and that he did not inspect the van that morning. He further admitted that when he realized Gomez had been abandoned in the van, he did not tell anyone at Countryside, call for emergency medical treatment, or check on her well-being. Nygaard further stated that "effective immediately" Countryside would be implementing a new safety protocol, requiring all vans to be searched by both the driver and another Countryside employee.

¶ 10    That evening, the Lake County Sheriff's Office arrested Gottardo and charged him with a Class 4 felony of reckless conduct under section 12-5(a)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/12-5(a)(2) (West 2012)), which provides that "A person commits reckless conduct when he or she, by any means, lawful or unlawful, recklessly performs an act or acts that *** cause great bodily harm or permanent disability or disfigurement to another person." Gottardo was indicted of two counts of reckless conduct, which specifically provided that he did the following:

"Count 1 *** committed the offense of RECKLESS CONDUCT,

in that the said defendant, while acting in a reckless manner,

caused great bodily harm to Lisa Gomez in that the said defendant,

the bus driver of Lisa Gomez, left Lisa Gomez, who was

unresponsive, in a secured vehicle in hot weather conditions[.]

*** 

"Count 2 *** committed the offense of RECKLESS CONDUCT,

in that the said defendant, while acting in a reckless manner,

caused great bodily harm to Lisa Gomez in that the said defendant,

the bus driver of Lisa Gomez, located Lisa Gomez, who was

unresponsive, in his assigned vehicle and failed to contact

emergency services[.]"

¶ 11    On February 11, 2014, Gottardo entered a negotiated guilty plea to Class 4 felony

reckless conduct in exchange for a sentence of 24 months probation.

¶ 12    Meanwhile, on September 6, 2013, counsel for Gomez sent a pre-suit settlement demand

letter to Philadelphia, which included the facts of the underlying incident as set out above, and

indicated that counsel was "authorized to accept a settlement from Countryside and Robert

Gottardo in the amount of six million dollars[.]" Counsel for Gomez also indicated that they

would "initiate ligation against Countryside and Robert Gottardo" if they did not receive a

response within seven days.

¶ 13    At some point thereafter, Pace became aware of Gomez's claim against Countryside. On

September 20, 2013, general counsel for Pace sent a letter to Countryside indicating that Pace

was "excluding this claim from coverage because we consider the conduct of Countryside's

employee, Robert Gottardo, both willful and wanton, and reckless." In the months that followed, counsels for Philadelphia and Pace exchanged a number of letters in which Philadelphia asserted that Pace had a duty to cover the claims, and Pace maintained that it did not.

¶ 14    On November 15, 2013, counsel for Gomez sent a letter to counsels for Philadelphia and Countryside, agreeing to pre-suit mediation so long as, among other things, "Principals from Countryside and PACE and/or their insurers with full authority to settle this case must attend the mediation in person." Counsel for Gomez also attached a draft complaint against Countryside and Pace to the letter, but indicated that he would "hold off filing suit until we exhaust our efforts to settle."

¶ 15    Counsel for Countryside forwarded that letter and draft complaint to Pace on November 22, 2013. Counsel for Countryside noted that the draft complaint contained a number of "allegations of negligence" including that Countryside "fail[ed] to check the van to confirm Gomez was removed from the van; fail[ed] to operate, inspect, supervise and manage the van and the unloading of disabled clients from the van; and failed to properly train its employees, including Gottardo." Counsel for Countryside maintained that these claims were covered by "the Agreement" and therefore, "Pace has a duty to defend Countryside in any lawsuit filed by Gomez."

¶ 16    Although Pace continued to maintain that Gomez's claims were excluded from coverage, it attended the first mediation session, but without authority to negotiate a settlement. Pace apparently did not attend further mediation sessions.

¶ 17    On January 9, 2014, counsel for Philadelphia emailed counsel for Pace. Counsel for Philadelphia stated that it had been participating in settlement negotiations, and was considering accepting the mediator's proposed settlement of $1.5 million. Counsel for Philadelphia asked

Pace to "accept its responsibility and agree to settle this matter on behalf of Countryside and Mr. Gottardo." In apparent anticipation that Pace would continue to deny the claim, counsel further stated that Philadelphia "fully intends to proceed against Pace to recover any judgment or settlement amount, defense costs incurred, and any other amounts that may be recoverable[.]"

¶ 18   At some point thereafter, Philadelphia paid $1.5 million to Gomez on behalf of Countryside in settlement of her claims. Pace did not contribute to that settlement amount.

¶ 19   On May 30, 2014, Philadelphia filed a four count complaint against Pace seeking recovery from Pace on the grounds of equitable subrogation, equitable contribution, unjust enrichment, and "Assignment from Countryside of all rights against Pace." Pace moved to dismiss Philadelphia's complaint pursuant to section 2-619 of the Code, arguing that Pace is a self-insured municipality—not an insurance carrier—and as a result, the doctrines of equitable subrogation and equitable contribution did not apply to it. Pace contended that its Risk Financing Program is publicly funded, and public policy does not support the use of public funds for tort liability. Pace further argued that even if it was considered an "insurer," it had no obligation to contribute anything to settle Gomez's claim, because "the loss was excluded under the Pace agreement." Pace specifically maintained that her damages were "the direct result of Gottardo's reckless conduct, and the Pace/Countryside agreement specified that Pace would not pay for damages due to the reckless conduct of Countryside employees."

¶ 20   Pace twice amended its motion to dismiss, and in its second amended motion, it attached an affidavit from Craig Kalck, the insurance manager for Pace. Kalck averred that Pace is "self-insured for commercial automobile coverage up to $3,000,000 through its Risk Financing Program," that "[a]pproximately 70% of the funding for Pace's Risk Financing Program is through RTA sales tax funding[,]" and that "Pace's Risk Financing Program is not reinsured."

Kalck further stated that if Pace was required to pay for a portion of the settlement, "the money will be paid entirely from Pace's Risk Financing Program. Pace has no insurance coverage of any kind that will indemnify Pace for payments within the self-insured retention of $3,000,000." After briefing and a hearing on Pace's motion, the circuit court dismissed the complaint against Pace, finding that under the Supreme Court's decision in *Antiporek v. Village of Hillside*, 114 Ill. 2d 246 (1986), it was against public policy to require Pace to pay from public funds, since it is a self-insured governmental entity.

¶ 21      In this appeal, Philadelphia challenges the circuit court's dismissal of its complaint pursuant to section 2-619 of the Code. Under section 2-619(a)(9) of the Code, a defendant may file a motion for dismissal on the grounds "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2010). "[A] motion to dismiss under section 2-619(a) of the Code [citation] admits the legal sufficiency of the complaint ***." *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). When ruling on the section 2-619 motion to dismiss, the trial court should construe the pleadings "in the light most favorable to the nonmoving party" and "must accept as true all well-pleaded facts in plaintiff's complaint and all inferences that may reasonably be drawn in plaintiff's favor." *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. Exhibits attached to the complaint become part of the complaint and will also be considered. *Abbott v. Amoco Oil Co.*, 249 Ill. App. 3d 774, 778-79 (1993). Thus, "the trial court may consider pleadings, depositions, and affidavits." *Zedella v. Gibson*, 165 Ill. 2d 181, 185 (1995). "We review an order granting a section 2-619(a)(9) motion *de novo*, considering whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Bainter v. Village of Algonquin*, 285 Ill. App. 3d

745, 750 (1996) (citing *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993)). Additionally, because we review the trial court's judgment, not its rationale, we may affirm for any reason supported by the record regardless of the basis cited by the trial court. *D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865, ¶ 30.

¶ 22     On a motion to dismiss pursuant to section 2-619(a)(9) of the Code, the defendant, as the movant, "has the burden of proof on the motion, and the concomitant burden of going forward." 4 Richard A. Michael, Illinois Practice § 41:8, at 481 (2d ed. 2011). "When a motion to dismiss is based on facts not apparent from the face of the complaint, the movant must support its motion with affidavits or other evidence." *City of Springfield v. West Koke Mill Development Corp.*, 312 Ill. App. 3d 900, 908 (2000); *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993); see also *Hollingshead v. A.G. Edwards & Sons, Inc.*, 396 Ill. App. 3d 1095, 1101-02 (2009) ("By presenting an affidavit supporting the basis for the motion, the defendant satisfies the initial burden of going forward ***."). If the defendant can carry this burden of going forward, "the burden then shifts to the plaintiff, who must establish that the affirmative defense asserted either is 'unfounded or requires the resolution of an essential element of material fact before it is proven.' " *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 383 (1997) (quoting *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 116). The plaintiff may establish this by presenting "affidavits or other proof." 735 ILCS 5/2-619(c) (West 2010). The plaintiff's failure to properly contest the defendant's affidavit by submitting a counteraffidavit may be fatal to his cause of action, as the failure to challenge or contradict supporting affidavits filed with a section 2-619 motion results in an admission of the fact stated therein. *Fayezi v. Illinois Casualty Co.*, 2016 IL App (1st) 150873, ¶ 44.

¶ 23    In this case, Pace brought its motion to dismiss pursuant to section 2-619 of the Code, arguing, among other things, that its status as a self-insured municipality prevented Philadelphia from bringing its claims. See *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 121 (2008) (holding that tort immunity is a proper affirmative matter because it completely negates the plaintiff's ability to bring the claim). In support of its motion, Pace filed an affidavit from its insurance manager, which established that Pace was self-insured up to $3 million and did not have any insurance coverage which would indemnify it for payments within the self-insured retention of $3 million. The trial court agreed that public policy prevented Philadelphia from bringing its claims, and dismissed Philadelphia's complaint against Pace.

¶ 24    In this court, Philadelphia does not challenge Pace's status as a self-insured municipality, but claims that the court erred in finding that "public policy allows Pace to avoid its contractual obligations" and dismissing its claim for equitable subrogation. Pace responds that equitable subrogation cannot be sought from a municipality's self-insured retention. Pace contends that it is not an "insurance carrier" that issues a "policy of insurance," and therefore, equitable subrogation does not apply. Pace additionally argues that even if the leasing agreement with Countryside could be considered an insurance policy, it would have no obligation to cover the claim because the leasing agreement contained an exclusion for reckless conduct.

¶ 25    Equitable subrogation is a remedial device that prevents unjust enrichment. *American Family Mutual Insurance Co. v. Northern Heritage Builders, L.L.C.*, 404 Ill. App. 3d 584, 588 (2010). An insurer who indemnifies its insured for a loss may be subrogated to the rights of the insured against the party at fault under the equitable doctrine that the economic burden " 'should be shifted to the party responsible for the loss.' " *State Farm General Insurance Co. v. Stewart*, 288 Ill. App. 3d 678, 686 (1997) (quoting *In re Estate of Ito*, 50 Ill. App. 3d 817,823 (1977)).

The purpose of equitable subrogation is grounded in equity to work out an adjustment between the parties "by securing the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it." 16 Steven Plitt, Daniel Maldonado & Joshua D. Rogers, Couch on Insurance 3d § 222:8, at 222-30 (2005). Subrogation is allowed to prevent injustice and unjust enrichment but will not be allowed where it would be inequitable to do so. *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319 (1992).

¶ 26     As our supreme court has explained, equitable subrogation and equitable contribution are distinctly different. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315-16 (2004). Equitable contribution arising among coinsurers permits one insurer who has paid the entire loss, or greater than its share of the loss, to be reimbursed from other insurers who are also liable for the same loss. *Id*. at 316. Subrogation, by contrast, places the *entire* burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged. *Id*.

¶ 27     To establish a right to equitable subrogation, Philadelphia bears the burden to establish the following: (1) that the defendant is primarily liable to the insured for a loss under a policy of insurance; (2) that the plaintiff is secondarily liable to the insured for the same loss under its policy; and (3) the plaintiff discharged its liability to the insured and at the same time extinguished the liability of the defendant. *Chicago Hospital Risk Pooling Program v. Illinois State Medical Inter-Insurance Exchange*, 397 Ill. App. 3d 512, 525 (2010) (citing *Home Insurance Co.*, 213 Ill. 2d at 316-17).

¶ 28     Pace relies on the following cases to argue that equitable subrogation cannot be sought from a municipality's self-insured retention and that public policy dictates that self-insured municipalities should not be "treated like commercial insurers": *Antiporek v. Village of Hillside*,

114 Ill. 2d 246, 250 (1986); *State Farm Automobile Insurance Co. v. Du Page County*, 2011 IL App (2d) 100580, ¶ 49 (2011); *Aetna Casualty & Surety Co. of Illinois v. James J. Benes & Associates, Inc.*, 229 Ill. App. 3d 413 (1992); and *Yaccino v. State Farm Mutual Automobile Insurance Co.*, 346 Ill. App. 3d 431, 440 (2004).

¶ 29    In *Antiporek*, 114 Ill. 2d at 248, our supreme court considered a case in which a child was injured while sledding on the Village of Hillside property, and the child's mother brought suit against the village for the child's injuries. When the plaintiff filed her complaint, the Local Governmental and Governmental Employees Tort Immunity Act granted certain immunities to local public entities but such immunities were waived if an entity was protected by a "policy of insurance" issued by an insurance "company" (Ill. Rev. Stat. 1983, ch. 85, ¶ 9-103(c)). *Antiporek*, 114 Ill. 2d at 247. The village participated in a risk pooling association, and the plaintiff argued that such participation operated to waive those immunities. The trial court entered judgment for the plaintiff, rejecting the village's immunity defense. The appellate court reversed, and the supreme court affirmed the appellate court, finding that the Village's pooled self-insurance was "tantamount" to self-insurance, not commercial insurance, and thus, did not waive the Village's tort immunity. *Id*. at 250-52.

¶ 30    The court, explaining the purpose behind the immunity waiver rule, stated that, in the case of commercial insurance, "the immunity is waived since government funds are no longer in jeopardy and immunity would inure to the benefit of private investors who have assumed the risk of insurers." *Id.* at 250. However, "when a municipality self-insures, it bears all risks itself, and settlements or awards are paid directly from government coffers." *Id.*

¶ 31    Likewise, in *State Farm Automobile Insurance Co.*, 2011 IL App (2d) 100580, ¶¶ 4-8, a Du Page County employee was involved in a car accident while driving a County-owned vehicle.

The employee was killed, and the other driver sued the County and the employee's estate for her injuries. *Id.* ¶ 6. State Farm, who insured the employee settled with the other driver for $400,000, then sought subrogation from the County. *Id.* ¶¶ 17-20. The court found that State Farm was not entitled to equitable subrogation because the County was a self-insured municipality and not an insurer or insurance company that provided insurance coverage. *Id.* ¶ 40. It thus found the first requirement of equitable subrogation to be lacking, specifically that "the defendant must be a *carrier* that is primarily liable to the insured for a loss under a policy of insurance." (Emphasis in original.) *Id.* See also *Aetna Casualty & Surety Co. of Illinois*, 229 Ill. App. 3d at 421-22 (holding that the Village of Clarendon Hill's pooled self-insurance "is not and ought not to be treated as a private insurance carrier," and thus had no obligation to contribute to a claim paid by Aetna); *Yaccino*, 346 Ill. App. 3d at 440 (holding that the City of West Chicago's self-insurance was not an "insurer," and, accordingly, a clause in State Farm insurance policy which provided that its coverage was excess where there was "other coverage" available from "any other insurer" did not apply).

¶ 32    The cases described above represent the common understanding of what constitutes "insurance" versus "self-insurance." The term "insurance," or an "insurance contract," generally refers to a policy issued by an authorized and licensed insurance company whose primary business is to assume certain risks of loss of its insureds, in exchange for the payment of a "premium." "Self-insurance," by contrast, is defined as " 'the retention of the risk of loss by the one upon whom it is directly imposed by law or contract.' " See *Fellhauer v. Alhorn*, 361 Ill. App. 3d 792, 796 (2005) (quoting *American Nurses Ass'n v. Passaic General Hospital*, 471 A.2d 66, 69 (N.J. Super. Ct. App. Div. 1984)). Unlike an insurance policy holder, a self-insuring municipality " 'bears all risks itself, and settlements or awards are paid directly from government

14

coffers.' " *State Farm Mutual Automobile Insurance Co.*, 2011 IL App (2d) 100580, ¶ 37 (quoting *Antiporek*, 114 Ill. 2d at 250).

¶ 33    Although we agree with the public policy outlined in the cases cited by Pace and would be hesitant to characterize Pace as an insurance company, we ultimately conclude that we need not reach the issue of whether public policy overrides the contractual promises to insure that Pace made in the lease agreement or whether Pace can be treated as an insurer issuing a policy of insurance. As stated above, this court can affirm the trial court's judgment for any reason supported by the record. Because we find the Pace provision excluding reckless conduct dispositive of this appeal, we will turn to an analysis of that issue. In so holding, we note that Philadelphia relies solely on *Illinois Municipal League Risk Management Ass'n v. State Farm Fire & Casualty Co.*, 2016 IL App (1st) 143336, to support its position that the public policy outlined in the above cases does not apply. However, because we are not deciding this case on that basis and because that case contains no exclusion similar to the one found here, we need not discuss it further.

¶ 34    Assuming that the leasing agreement between Pace and Countryside provides insurance coverage, that leasing agreement provides that Pace shall provide coverage for claims of "bodily injury, death, or property damage arising directly out of the provision of Transportation Services provided with Pace vehicles as described in this agreement" except that " any claims, actions, damages arising as the result of *** reckless *** conduct of [Countryside], [or] its *** employees" are excluded from coverage.

¶ 35    The facts of the underlying claim against Countryside, which can be found in the record and which were never disputed by Philadelphia, indicate that Gottardo transported Gomez to the Countryside facility in a Pace vehicle, and left her in the vehicle for five hours on a 90 degree

day. Before leaving, Gottardo indicated that he had checked the van and that it was empty, and informed other Countryside employees that Gomez was a "no-show." When Gottardo came back later that afternoon, he saw Gomez in the back of the van but did not check on her, call for medical assistance, or tell anyone that he had abandoned her in the van all day. Based on the above facts, Gottardo was charged with, and pleaded guilty to, reckless conduct.

¶ 36    Pace contends that because Gottardo pleaded guilty to felony reckless conduct, Philadelphia should be collaterally estopped from arguing that his conduct was anything less than reckless. Philadelphia disagrees, and argues that because Gottardo entered a negotiated plea of guilty, collateral estoppel should not apply. See *Talarico v. Dunlap*, 177 Ill. 2d 185, 195 (1997) ("Ordinarily, when a fact has been admitted by a litigant, it is reasonable to presume that the fact is established and that the fact should not be subject to relitigation. We do not believe, however, that the same may be said in every case of a negotiated guilty plea.").

¶ 37    However, even without resorting to the doctrine of collateral estoppel, we find no question of material fact regarding whether Gomez's injuries were caused by the reckless actions of Gottardo, a Countryside employee. The term "reckless" has a particular legal meaning, and is defined in our Criminal Code as follows:

> "A person is reckless or acts recklessly when that person
> consciously disregards a substantial and unjustifiable risk that
> circumstances exist or that a result will follow, described by the
> statute defining the offense, and that disregard constitutes a gross
> deviation from the standard of care that a reasonable person would
> exercise in the situation. An act performed recklessly is performed
> wantonly, within the meaning of a statute using the term

'wantonly', unless the statute clearly requires another meaning."

720 ILCS 5/4-6 (West 2012).

¶ 38    Similarly, in the civil context, both the legislature and the supreme court have defined reckless/willful and wanton conduct as conduct committed with "utter indifference" to or "conscious disregard" for the safety of others. *Kirwan v. Lincolnshire-Riverwoods Fire Protection District*, 349 Ill. App. 3d 150, 155 (2004) (citing 745 ILCS 10/1-210 (West 2002) and *Pfister v. Shusta*, 167 Ill. 2d 417, 421 (1995)).

¶ 39    The facts of the underlying incident described above can lead only to the conclusion that Gottardo behaved with "utter indifference" to or "conscious disregard" for "a substantial and unjustifiable risk" of harm to Gomez, when he left her in a van for five hours on a 90 degree day, and failed to check on her well-being or seek medical care upon later discovering her in the van. There is no question that such conduct constituted a "gross deviation from the standard of care that a reasonable person would exercise in the situation." Accordingly, Gottardo acted recklessly, which excludes the resulting claims from coverage under the leasing agreement. Philadelphia never challenged the account provided in the record or provided any facts contradicting that account or that would otherwise tend to show that Gottardo's conduct could be found to be anything less than reckless.

¶ 40    Because the claim at issue would be excluded under the agreement, equitable subrogation could not apply. Thus, even assuming Pace was providing an insurance policy, we could not say that Pace would be the insurance carrier who was "primarily liable to the insured for [the] loss," since it was explicitly excluded under the leasing agreement. *Chicago Hospital Risk Pooling Program*, 397 Ill. App. 3d at 525.

¶ 41    Philadelphia disagrees and contends that the reckless conduct exclusion in the Pace leasing agreement does not apply. It initially "submits" that an exclusion based on reckless conduct is "void and unenforceable as a matter of Illinois public policy" because "the public policy of Illinois for automobile liability coverage has always been focused toward protecting people." Philadelphia cites no authority in support of this "public policy" argument, and we find that Philadelphia has waived consideration of it in this appeal. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 98.

¶ 42    Philadelphia additionally argues that Gomez's draft complaint contains allegations of negligence, which Philadelphia claims causes the loss at issue to be covered under the leasing agreement. In support, Philadelphia cites case law regarding an insurer's "duty to defend"—that "if several theories of recovery are alleged in the underlying complaint against the insured, the insurer's duty to defend arises even if only one of several theories is within the potential coverage of the policy." *General Agents Insurance Co. of America, Inc. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155 (2005). However, even assuming that the leasing agreement provided insurance coverage, an insurer's duty to defend only arises when a lawsuit is filed. The question of whether an insurer has a duty to defend its insured against a lawsuit is answered by comparing the allegations of that suit, liberally construed in favor of the insured, with the language of the insurance policy. *Fremont Casualty Insurance Co. v. Ace-Chicago Great Dane Corp.*, 317 Ill. App. 3d 67, 73 (2000) (citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 125 (1992)). Here, Philadelphia chose to settle Gomez's claim before a complaint was ever filed. In such circumstances, the duty to defend was never triggered. *Id.*

¶ 43    Moreover, Philadelphia's argument regarding claims of negligence also fails for another reason. As described previously, equitable subrogation is a device used to place the *entire* burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged. *Home Insurance Co.*, 213 Ill. 2d at 316. Because we have found that Gomez's claims arose out of the reckless conduct of Gottardo, Philadelphia cannot simply point to various other claims of negligence to contend that Pace should be responsible for paying for those claims under equitable subrogation. Equitable subrogation is different from equitable contribution, under which a court may apportion a loss between multiple insurers so that each pays their equitable share. *Id*. We thus conclude that the circuit court properly dismissed Philadelphia's equitable subrogation claim.

¶ 44    Philadelphia next argues that the circuit court erred in finding that it is not entitled to equitable contribution from Pace. Philadelphia pleaded this claim as an alternative to its equitable subrogation claim, in the event that the trial court found that Pace and Philadelphia shared responsibility for the claims equally. "The doctrine of equitable contribution permits an insurer that has paid the entire loss to be reimbursed by other insurers that are also liable for the loss." *Liberty Mutual Insurance Co. v. Westfield Insurance Co.*, 301 Ill. App. 3d 49, 52 (1998). The doctrine of equitable contribution "arises from a right which is independent from the rights of the insured, to recover from a co-obligor who shares the same liability as the party seeking contribution." *Argonaut Insurance Co. v. Safway Steel Products, Inc.*, 355 Ill. App. 3d 1, 10-11, (2004). The doctrine may arise where the insurance policies at issue "cover a risk on the same basis and there is an identity between the policies as to parties and insurable interests and risks." *Home Indemnity Co. v. General Accident Insurance Co. of America*, 213 Ill. App. 3d 319, 321 (1991). In order for an insurer to recover under a theory of equitable contribution, the insurer

19

seeking contribution must prove (1) all facts necessary to the claimant's recovery against the insured, (2) the reasonableness of the amount paid to the insured, and (3) an identity between the policies as to parties and insurable interests and risks. *Schal Bovis, Inc. v. Casualty Insurance Co.*, 315 Ill. App. 3d 353, 362 (2000) (citing *Royal Globe Insurance Co. v. Aetna Insurance Co.*, 82 Ill. App. 3d 1003, 1005 (1980)).

¶ 45    Philadelphia relies on essentially the same reasoning to argue that the trial court erred in concluding that equitable contribution did not apply to Pace, as a self-insured municipality. However, as we have previously found that the loss at issue was not covered under the leasing agreement, Philadelphia is unable to succeed on a claim of equitable contribution.

¶ 46    Moreover, Philadelphia's equitable contribution claim also fails because the leasing agreement does not cover the same risks as the Philadelphia policy. Equitable contribution applies to multiple, concurrent insurance situations and is only available where the concurrent policies insure the same entities, the same interests, and the same risks. *Home Insurance Co.*, 213 Ill. 2d at 316. These elements must be met before the insurance can be considered concurrent or double; accordingly, there can be no claim of equitable contribution when two insurers cover separate and distinct risks. *Id.*

¶ 47    In this case, even if we were to consider the leasing agreement a policy of insurance, the leasing agreement applies only to claims "arising directly out of the provision of Transportation Services provided with Pace vehicles" and specifically excludes damages "arising from" the "reckless *** conduct *** of" Countryside or its employees. The Philadelphia policy, by contrast, provides coverage for "covered autos"—including owned, hired, and non-owned autos—and does not contain an equivalent exclusion. Accordingly, the policies are not

20

"concurrent" because they do not insure the same risks, and Philadelphia's claim of equitable contribution must fail.

¶ 48    Philadelphia next argues that the court erred in dismissing its unjust enrichment claim. Pace responds that Philadelphia's claim fails because its payment of the Gomez settlement was "not a benefit to Pace" since Pace, as a self-insured municipality, "had no duty to pay the settlement from public funds."

¶ 49    To state an action for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989). For a cause of action based on a theory of unjust enrichment to exist, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty. *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1025 (2009) (citing *Lewis v. Lead Industries Ass'n*, 342 Ill. App. 3d 95, 105 (2003)).

¶ 50    As we have previously found that Pace had no obligation to contribute to the Gomez settlement, Philadelphia cannot establish that Pace has unjustly retained a benefit. Similarly, there is no question that the claim was covered under the Philadelphia policy or that its insureds (Countryside, and specifically, Gottardo as a Countryside employee) were responsible for the acts that caused Gomez's injuries. As a result, Philadelphia cannot prove that paying the Gomez claim was a detriment to it. Finally, Philadelphia cannot establish that not requiring Pace to contribute to the claim violates the fundamental principles of justice, equity, and good conscience, in light of the public policy considerations described above. Accordingly, Philadelphia's unjust enrichment claim necessarily fails.

¶ 51    Finally, Philadelphia claims that it is entitled to reimbursement for Pace pursuant to an assignment of Countryside's rights. We initially note that Philadelphia's argument on this point is one sentence long, contains no citation of authority, and merely states that Pace challenged this claim based on the use of public funds and that the claim was excluded under their policy. Accordingly, we find that Philadelphia has waived consideration of this argument. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Pepper Construction Co.*, 2016 IL App (1st) 142754, ¶ 98.

¶ 52    Nonetheless, even if we were to address Philadelphia's claim, we would conclude that it fails. Assuming a valid assignment, Philadelphia can only have the rights, claims, and causes of action that Countryside may have against Pace related to the Gomez settlement. See *Cameron v. Illinois Steel Co.*, 162 Ill. App. 461, 465 (1911) ("Of course, if there was no cause of action, Cameron could acquire nothing by the assignment to him."). Because the previously discussed claims are not meritorious and because the leasing agreement excludes the Gomez settlement, Countryside would not be able to recover against Pace. Accordingly, Philadelphia cannot maintain an action pursuant to an assignment from Countryside.

¶ 53    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 54    Affirmed.