MIDWEST DECKS, INC., Plaintiff, v. BUTLER AND BARETZ ACQUISITIONS, INC., *et al.*, Defendants (Lloyd J. Baretz, Intervening Plaintiff-Appellant; Midwest Decks, Inc., Plaintiff and Intervened Defendant-Appellee).

First District (2nd Division)    No. 1—93—3177

Opinion filed April 18, 1995.

Schuyler, Roche & Zwirner, P.C., of Chicago (Richard S. Weinberg and Michael F. Braun, of counsel), for appellant.

Law Offices of Peter B. Canalia, of Lansing (William P. Drew III, of counsel), for appellee Chillicothe Supply Co.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

On April 2, 1992, plaintiff Midwest Decks, Inc. (Midwest), and defendant Butler & Baretz Acquisition, Inc., d/b/a Mid-America Decks, Inc. (Butler & Baretz), executed an "Asset Purchase Agreement" (the purchase agreement) for the bulk sale of Midwest's assets. Butler & Baretz agreed to pay a total of $232,000 in four installments, the first of which was $82,000, due at the time of closing. Section 1.04(d) of the agreement, a "cash hold-back" provision, stated that

"[o]n the closing date, the Purchase Price installment set forth in *Section 1.04(b)(1)* shall be reduced by, and Buyer shall hold, the amount of any Stop Order received from the Illinois Department of Revenue. Buyer shall pay to Seller, the balance, without interest, if any, of the amount so withheld after all amounts owing to the Illinois Department of Revenue have been paid in full and within five (5) days of such payment."

On April 2, 1992, the closing date, $23,200 was subject to the cash hold-back provision because the Illinois Department of Revenue (the Department) claimed a lien on that amount. On October 26, 1992, the Department informed Midwest's attorneys that after reviewing the bulk sale, it had determined that no taxes were due.

However, Butler & Baretz did not pay the $23,200 to Midwest, asserting that Midwest had breached the purchase agreement, thus terminating any payment obligations. In the meantime, Butler & Baretz had defaulted on a $150,000 loan received from La Salle National Bank to facilitate its purchase of Midwest's assets. Consequently, it planned to liquidate its assets at a public sale on January 27, 1993, in order to satisfy its obligation to La Salle and other creditors.

On January 22, 1993, Midwest filed a complaint for "declaratory judgment and other relief" claiming, *inter alia*, that it had a right to $23,200 from the sale of Butler & Baretz's assets and requesting pay-

ment prior to the satisfaction of other creditors' claims.[1] On the same day, Midwest filed an emergency motion for a temporary restraining order to prevent the sale of Butler & Baretz's assets. The trial court denied the motion, but ordered that $23,200 in proceeds from the sale be deposited with the clerk of the court to be held in an interest-bearing account until further order of the court.

Midwest filed an amended verified complaint on February 4, 1993. On March 3, 1993, Lloyd Baretz, the father of one of the principals of Butler & Baretz, petitioned to intervene in the action, claiming that he had a superior right to the proceeds in relation to Midwest. The trial court entered an agreed order allowing Lloyd Baretz to intervene in the action.

According to his pleadings and attachments thereto, Lloyd Baretz had loaned $150,000 to Butler & Baretz on July 24, 1992. The loan was evidenced by a secured promissory note expressly subordinate to La Salle National Bank's secured interest. The parties executed a security agreement under which Lloyd Baretz obtained a security interest in Butler & Baretz's machinery, equipment, accounts receivable, all tangible and intangible property in its possession, and in after-acquired property. Additionally, Lloyd Baretz was granted a security interest in any proceeds from the sale of the collateral. He filed a financing statement with the Secretary of State on August 14, 1992. His verified complaint indicated that the balance due on the note exceeded $23,200.

On June 4, 1993, the parties filed a "Stipulation to Dismiss" La Salle National Bank, agreeing that "all matters in controversy" had been "fully settled." The trial court entered an order dismissing La Salle National Bank with prejudice on the same day. The details of the settlement with the bank are not of record.

Shortly thereafter, Lloyd Baretz moved for summary judgment. He reiterated his claim that the balance due on the promissory note evidencing his $150,000 loan to Butler & Baretz exceeded $23,200. He argued that since he held a perfected security interest in the equipment and assets sold, he had a right to the proceeds subordinate only to La Salle National Bank's interest in the same collateral. He reasoned that since the debt owed to La Salle National Bank had been satisfied, he had a right to the $23,200 being held by the clerk of the court.

---

[1]The other counts included a claim that Butler & Baretz had collected on one of Midwest's accounts receivable in violation of the purchase agreement, and a claim that the equipment Butler & Baretz planned to sell actually belonged to Midwest.

On August 6, 1993, Chillicothe Supply Co. (Chillicothe), as assignee of Midwest, filed a counterclaim and a motion for "Declaratory and Summary Judgment against Lloyd J. Baretz, Intervenor and in favor of Chillicothe." Chillicothe argued that the $23,200 never belonged to Butler & Baretz, and that, therefore, Lloyd Baretz could not have a lien on that property. Chillicothe further argued that the $23,200 was held in constructive trust for the benefit of either Midwest or the Department of Revenue and that Butler & Baretz could not pledge those funds as assets.

After a hearing, the trial court denied Lloyd Baretz's motion for summary judgment and ordered the clerk of the court to release the $23,200 plus interest to Chillicothe. The judge explained that

> "the $23,200 was not—and I wish to emphasize, not an asset of Butler & Baretz. Was not subject to the security agreement between Mr. Lloyd Baretz and was an amount of money representing a portion of the purchase price that Butler—Butler & Baretz owed to Midwest Decks and were held pursuant to the stop order of the State of Illinois. Insofar as they were holding those monies, they were holding those monies in a fiduciary capacity for the benefit of Midwest Decks."

Lloyd Baretz now appeals, claiming that the trial court erred in denying his motion for summary judgment and that he had a superior interest in the proceeds in relation to Chillicothe.

Summary judgment is appropriate in those cases where there is "no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." (735 ILCS 5/2—1005(c) (West 1992).) In determining whether there is a genuine issue of fact, the court must consider all pleadings, affidavits, depositions, and admissions filed. (See 735 ILCS 5/2—1005(c) (West 1992).) Our supreme court has explained that summary judgment is favored as a mechanism to achieve the expeditious termination of litigation, while recognizing that it is a drastic measure reserved for cases in which "the right of the moving party is clear and free from doubt." Consequently, pleadings and other filings must be construed liberally in favor of the nonmovant. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.) Summary judgment orders are reviewed *de novo*. *Arra v. First State Bank & Trust Co.* (1993), 250 Ill. App. 3d 403, 406, 621 N.E.2d 128, 130-31.

The case at bar was appropriate for summary disposition since no genuine issues of fact were raised. The parties' dispute revolved

around a question of law, *i.e.,* which party was entitled to the proceeds.[2]

The trial court did not conduct an analysis under the relevant provisions of the Uniform Commercial Code—Secured Transactions (UCC). (810 ILCS 5/9—101 *et seq.* (West 1992).) However, since Lloyd Baretz had a perfected security interest in Butler & Baretz's assets, the UCC is applicable to a determination of his rights, if any, in the proceeds from the sale of those assets.

■ Article 9 of the UCC governs secured transactions and provides "a comprehensive scheme for the regulation of security interests in personal property and fixtures." (810 ILCS Ann. 5/9—101, Uniform Commercial Code Comment (Smith-Hurd 1993).) The goal of article 9 is to establish a simple and uniform structure within which secured financing transactions can be conducted. (810 ILCS Ann. 5/9—01, Uniform Commercial Code Comment (Smith-Hurd 1993).) In addition, article 9 is meant to protect creditors by providing them with greater security than they had under pre-Code laws. (8 R. Anderson, Anderson on the Uniform Commercial Code § 9—102:5, at 451 (1985).) With few exceptions, article 9 applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts." 810 ILCS 5/9—102(1)(a) (West 1992); see also 8 R. Anderson, Anderson on the Uniform Commercial Code § 9—102:6, at 451-52 (1985) (commenting on the all-inclusive nature of article 9).

■ Three prerequisites must be met in order to create a security interest which "attaches" and is enforceable against the debtor or a third party: (1) the collateral must be in the possession of the secured party or the debtor must sign a security agreement which describes the collateral; (2) value must be given; and (3) the debtor must have rights in the collateral. (810 ILCS 5/9—203(1), (2) (West 1992).) The Code does not define the term "rights in the collateral," but it is generally recognized that rights in the collateral may be sufficient if: the debtor has possession and title to the goods (*Central National Bank v. Worden-Martin, Inc.* (1980), 90 Ill. App. 3d 601, 604, 413 N.E.2d 539, 541-42); the true owner consents to the debtor's use of the collateral

---

[2]Chillicothe states that the exact amount due to Lloyd Baretz is unknown. However, Lloyd Baretz's verified complaint alleged that the balance exceeded $23,200 and Chillicothe did not deny this allegation. See 735 ILCS 5/2—610(b) (West 1992); *In re Estate of Jensik* (1962), 34 Ill. App. 2d 130, 133, 180 N.E.2d 740, 742 (factual allegations in a verified complaint are admitted if not denied).

as security; or the true owner is estopped from denying the creation of the security interest because " 'he has allowed another to appear as the owner, or as having full power of disposition over the property, so that an innocent person is led into dealing with such apparent owner' " (*In re Pubs, Inc.* (7th Cir. 1980), 618 F.2d 432, 437-38 (applying Illinois law), quoting *Mori v. Chicago National Bank* (1954), 3 Ill. App. 2d 49, 51, 120 N.E.2d 567, 568).

■ A security interest in most collateral is perfected by the filing of a financing statement with the Illinois Secretary of State. (See 810 ILCS 5/9—302, 9—401(c) (West 1992).) Once the interest in the original collateral is perfected, the security interest in the proceeds[3] from the collateral is also perfected. (810 ILCS 5/9—306(2) (West 1992); *In re Keneco Financial Group, Inc.* (N.D. Ill. 1991), 131 Bankr. 90, 93; see also *In re Estate of Philp* (1983), 114 Ill. App. 3d 107, 109-10, 448 N.E.2d 535, 536-37.) When security interests conflict, the first to attach takes priority and, as a general rule, the holder of a perfected security interest takes priority over the interests of unsecured creditors.[4] 810 ILCS 5/9—312(5) (West 1992); *Herman v. First Farmers State Bank* (1979), 73 Ill. App. 3d 475, 477, 392 N.E.2d 344, 345.

■ In the case at bar, Lloyd Baretz complied with the UCC in perfecting his security interest in the collateral provided by Butler & Baretz. He and the principals of Butler & Baretz executed a security agreement describing the collateral; value was given in the amount of $150,000; and Butler & Baretz had rights in the property by virtue of the contract provision which stated that title passed at the time of execution. Lloyd Baretz perfected his security interest by filing a financing statement.[5] Midwest, Chillicothe's assignor, had no security agreement with Butler & Baretz. Thus, Chillicothe's interest in the proceeds is subordinate to Lloyd Baretz's perfected security interest. (See *Herman*, 73 Ill. App. 3d at 477, 392 N.E.2d at 345.) Moreover, the issue of whether Butler & Baretz rightfully withheld payment of

---

[3]The term "proceeds" is defined under the UCC as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." 810 ILCS 5/9—306(1) (West 1992).

[4]The primary exceptions to this rule are inapplicable in the case at bar; they apply to buyers in the ordinary course of business and certain buyers of consumer goods. 810 ILCS 5/9—307(1), (2) (West 1992).

[5]The record is devoid of evidence that Lloyd Baretz was aware of the cash hold-back provision of the purchase agreement. Even if he had knowledge of its existence, his rights under article 9 would be unaffected. See 810 ILCS 5/9—312(5)(b) (West 1992); 9 R. Anderson, Anderson on the Uniform Commercial Code § 9—312:52—56, at 488-91 (1994).

the $23,200 is irrelevant, since Lloyd Baretz is entitled to the proceeds as a secured creditor.

Despite the fact that title passed upon execution of the contract, Chillicothe argues that Lloyd Baretz cannot have a right to proceeds from property which Butler & Baretz never owned, agreeing with the trial court that the $23,200 was not subject to the security agreement. Even if title had not passed, as noted above, under the UCC, a debtor may have sufficient rights in the collateral without all of the technical requisites of ownership. (See *Interfirst Bank v. Lull Manufacturing* (5th Cir. 1985), 778 F.2d 228, 233 (observing that "the buyer's 'power to encumber' arises upon delivery and does not terminate, despite nonpayment, as long as the buyer retains possession").) In *Worden-Martin*, we found that a secured creditor had priority over a seller even though the debtor-buyer never paid for the property. In that case, a car auctioneer sold a car to a dealer who took possession while the auctioneer retained the certificate of title; the parties did not execute a security agreement. The dealer promised later payment, but his subsequently issued check was dishonored. The dealer's bank held a perfected security interest in his inventory. We found that the sale of the car was a credit transaction and that title had passed to the dealer, providing him with sufficient rights in the collateral under the UCC. We accordingly held that the bank's perfected security interest prevailed over the auctioneer's unsecured interest. *Worden-Martin*, 90 Ill. App. 3d at 604, 413 N.E.2d at 541-42.

Similarly, in *Andrews v. Mid-America Bank & Trust Co.* (1987), 152 Ill. App. 3d 139, 503 N.E.2d 1120, we found that the plaintiff debtor had sufficient rights in the collateral to create an enforceable security interest even though he did not have title to the collateral. The plaintiff had purchased a tractor and trailer from the defendant, and they had executed a security agreement whereby the defendant obtained a security interest in the tractor and trailer and other property. The plaintiff failed to make scheduled monthly payments, and the defendant repossessed the tractor and trailer. The plaintiff argued that the consideration for the security agreement failed because he never obtained title to the collateral and that, therefore, the agreement never attached and was unenforceable. We disagreed, finding that since the plaintiff had possession of the property, he had acquired rights in it despite the absence of formal written title. *Andrews*, 152 Ill. App. 3d at 143-44, 503 N.E.2d at 1122-23; see also *In re White Farm Equipment Co.* (N.D. Ill. 1986), 63 Bankr. 800, 806-07 (holding that in order to comport with the UCC and to avoid creation of a secret lien, the secured party was entitled to rely on filed financing statements, and the unsecured creditor who claimed that the

debtor had no rights in encumbered inventory could not claim title to the goods or the proceeds thereof).

■ Likewise, in the case at bar, Chillicothe's argument that Lloyd Baretz's security agreement never attached to $23,200 in proceeds because the debtor, Butler & Baretz, owed that money to Midwest must also fail. Butler & Baretz had rights in the collateral because it had possession of, and title to, the property. Therefore, Lloyd Baretz's perfected security interest takes priority over Chillicothe's unsecured interest in payment of the debt. *Cf. Arena Auto Auction, Inc. v. Mecum's Countryside Motor Cos.* (1993), 251 Ill. App. 3d 96, 621 N.E.2d 254 (holding that, under the Illinois Vehicle Code, the debtor had sufficient interest in automobiles purchased on credit for creditor's security interest in its inventory to attach).

■ Chillicothe contends that section 1(d) of the purchase agreement constituted an escrow agreement and that Reginald Butler, one of the principals of Butler & Baretz, acted as escrowee. However, neither the terms of the contract nor anything else in the record supports that contention.

An escrow is "a written instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or third party, to be kept by the depository until the performance of a condition or the happening of a certain event and then to be delivered over to the grantee, promisee or obligee." (*Rinehart v. Rinehart* (1957), 14 Ill. App. 2d 116, 123, 143 N.E.2d 398, 402; see also Black's Law Dictionary 545 (6th ed. 1990).) The cash hold-back provision of the purchase agreement in the case at bar did not call for setting up an escrow account or for segregating the funds; they were to be paid as part of the sales price less any taxes due to the State. Additionally, the purchase agreement did not call for deposit of the funds with a third party; rather, it specifically stated that the "Buyer" was to hold the money until the tax liability was settled. Compare *Melrose Park National Bank v. Carr* (1993), 249 Ill. App. 3d 9, 15, 618 N.E.2d 839, 841 (an escrow agreement existed between the parties to a sale of real estate when the buyer's attorney was asked to hold $45,000, which was to be paid at the closing as the balance due on the down payment, and he acknowledged in a letter to the seller's attorney that he was holding that sum); *Federal Deposit Insurance Corp. v. Knostman* (7th Cir. 1992), 966 F.2d 1133, 1140-41 (an escrow agreement in a gas and oil purchase contract was not defeated when the escrowee named in the parties' contract did not hold the funds, but another third party, counsel for one of the parties, held them in a trust account).

Chillicothe also argues that the trial court's ruling is justified under a theory of either a constructive trust or a resulting trust. A constructive trust arises by operation of law (*Suttles v. Vogel* (1988), 126 Ill. 2d 186, 193, 533 N.E.2d 901, 904) and is generally imposed by a court of equity to prevent unjust enrichment (*Chicago Park District v. Kenroy, Inc.* (1982), 107 Ill. App. 3d 222, 224, 437 N.E.2d 783, 785; see also V A. Scott, Scott on Trusts § 462.2, at 313 (1989)). A constructive trust is held to exist when the plaintiff shows that some equitable principle will be violated if the defendant is permitted to retain the beneficial interest of the property at issue. (*Chicago Park District*, 107 Ill. App. 3d at 224, 437 N.E.2d at 785.) A constructive trust is normally imposed when there has been actual or constructive fraud or where there has been a breach of fiduciary duty. (*Suttles*, 126 Ill. 2d at 193, 533 N.E.2d at 904.) Our supreme court has instructed that

"[a] constructive trust will not be imposed unless the complaint makes specific allegations of wrongdoing [citations], such as fraud, breach of fiduciary duty, duress, coercion or mistake. Furthermore, the grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead but to one conclusion. [Citations.]" *Suttles*, 126 Ill. 2d at 194, 533 N.E.2d at 905.

■ The trial court agreed with Chillicothe that the funds were held in a fiduciary capacity by Butler & Baretz on Midwest's behalf. Relevant factors in determining whether a fiduciary relationship exists include: the degree of kinship between the parties; the disparity in age, health and mental condition, education, and business experience between the parties; and the extent to which the allegedly "servient party" entrusted the handling of its business affairs to the "dominant party" and placed trust and confidence in it. (*Pottinger v. Pottinger* (1992), 238 Ill. App. 3d 908, 917, 605 N.E.2d 1130, 1138-39; *In re Estate of Rothenberg* (1988), 176 Ill. App. 3d 176, 180-81, 530 N.E.2d 1148, 1151.) The party asserting a fiduciary relationship must show that it placed its trust and confidence in another who thereby gained dominance over that party. (See *Northern Trust Co. v. Burlew* (1988), 171 Ill. App. 3d 1000, 1003, 525 N.E.2d 1123, 1126, *appeal denied* (1988), 123 Ill. 2d 560, 535 N.E.2d 403.) Generally, where parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist. *De Witt County Public Building Comm'n v. County of De Witt* (1984), 128 Ill. App. 3d 11, 26, 469 N.E.2d 689, 700.

■ The facts of this case do not support imposition of a constructive trust. The money held back was part of the purchase price for Midwest's assets. This is clear from the cash hold-back provision in

the purchase agreement and from the fact that the same amount was deducted from Butler & Baretz's initial payment. Midwest and Butler & Baretz were two businesses, presumably negotiating at arm's length. While article 9 has not displaced equitable remedies, such as constructive trust and resulting trust (see 8 R. Anderson, Anderson on the Uniform Commercial Code § 9—102:34, at 470 (1985)), there is no indication in the record that Midwest was a servient party, trusting Baretz to act for its benefit (see *Northern Trust Co.*, 171 Ill. App. 3d at 1003-04, 525 N.E.2d at 1126 (refusing to find a fiduciary relationship between a debtor and a creditor which would give rise to a constructive trust in collateral)). Furthermore, mere nonpayment of a money debt is insufficient wrongdoing to justify imposition of a constructive trust. (See *In re T. Brady Mechanical Services, Inc.* (N.D. Ill. 1991), 133 Bankr. 441, 446; see also *White Farm*, 63 Bankr. at 807-08.) Consequently, Chillicothe's argument that the trial court's order is justified under a theory of constructive trust is without merit.

■ Chillicothe's argument that a resulting trust theory supports the trial court's decision is equally unpersuasive. A resulting trust, like a constructive trust, arises by operation of law, but its existence depends on the intent of the parties and, as such, it is more like an express trust than a constructive trust. (See *Bozeman v. Sheriff* (1976), 42 Ill. App. 3d 228, 230-31, 355 N.E.2d 624, 626.) Resulting trusts arise in three situations: when an express trust fails; when an express trust is fully performed but the trust estate has not been exhausted; and when one party pays for property and directs the vendor to convey it to another. (V A. Scott, Scott on Trusts § 404.1, at 7 (1989).) In the case at bar, there is no evidence that the parties intended to set up such a trust. (See *Fender v. Yagemann* (1963), 29 Ill. 2d 205, 193 N.E.2d 794 (refusing to find a resulting trust when the record did not show that the conveyor of property intended to retain a beneficial interest in the property).) Moreover, Chillicothe has cited no case law on resulting trusts nor has it presented any argument supporting this contention; therefore, it has waived this argument on appeal. 134 Ill. 2d R. 341(e)(7).

■ Chillicothe finally makes a general argument that equity demands that it take the funds. However, while Chillicothe may be owed a debt by Butler & Baretz, Lloyd Baretz's perfected security interest takes priority over Chillicothe's unsecured interest. See *White Farm*, 63 Bankr. at 807 (recognizing the harsh result of the application of the UCC for an unsecured creditor); 8 R. Anderson, Anderson on the Uniform Commercial Code § 9—102:10, at 455 (1985) (noting that "the fact that the creditor possesses the rights given to him by Article 9 is not unconscionable").

The trial court expressed its concern that if he ruled in favor of Lloyd Baretz, any trustee

> "that was holding trust funds of a third party could apparently lists [*sic*] those assets, \*\*\* which they are holding as trustee, as their assets. And in the event of liquidation, not only liquidate their own assets, but liquidate the trust's assets for whom they are holding to the benefit of a beneficiary \*\*\*. Makes absolutely no sense."

This concern is without any basis in the record in this case because, as we have explained above, Butler & Baretz were not trustees, but rather were debtors of Midwest; consequently, there is no danger that recognition of Lloyd Baretz's perfected security interest would lead to trustees' misuse of beneficiaries' property.

Since Midwest did not set up an escrow account, perfect its security interest in the goods, or take any measure to protect its interest in the proceeds from the goods, its interest is subordinate to Lloyd Baretz's perfected security interest. Consequently, the trial court erred in denying Lloyd Baretz's motion for summary judgment. We therefore reverse its ruling and order that the $23,200 in proceeds, plus interest, be released to Lloyd Baretz.

Reversed with directions.

DiVITO and McCORMICK, JJ., concur.