2020 IL App (1st) 190767-U

THIRD DIVISION
August 19, 2020

No. 1-19-0767

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 L 5693 |
| | ) | |
| MB FINANCIAL BANK, N.A. and | ) | |
| MICHAEL A. PRATE, INC., | ) | Honorable |
| | ) | Patrick J. Sherlock, |
| Defendant-Appellees. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County dismissing counts I through IV of plaintiff's complaint and granting summary judgment in favor of defendants as to count V is affirmed; the payment at issue was not an "asset" as defined by the Illinois Uniform Fraudulent Transfer Act (IUFTA) and therefore could not be a fraudulent transfer under the IUFTA.  Additionally, there was no unjust enrichment where the recipient of the payment at issue had superior rights to the funds than that of plaintiff.

¶ 2    The question presented in this appeal is whether a payment made by defendant, Michael

A. Prate, Inc. (Prate, Inc.) on an unmatured personal loan to defendant, MB Financial Bank, N.A.

(MB), constituted a fraudulent transfer under the IUFTA.  Michael A Prate, the sole owner of

Prate, Inc., took out a personal loan from defendant MB.  Prate, Inc. was a guarantor on the loan

and Prate, Inc.'s property, including the funds from which the payment was made, was collateral pledged as security for the personal loan pursuant to a commercial security agreement. Plaintiff was a creditor of Prate, Inc. when the payment was made to MB and, at that time, Prate Inc. was insolvent. Plaintiff claimed Prate, Inc. had failed to make certain payments for the worker's compensation insurance plaintiff had provided Prate, Inc.

¶ 3    To recover the payment made by Prate, Inc. to MB, plaintiff filed a complaint alleging: (1) count I, actual fraud pursuant to section 5(a)(1) of the IUFTA (740 ILCS 160/5(a)(1) (West 2010)); (2) count II, constructive fraud pursuant to section 5(a)(2) of the IUFTA (740 ILCS 160/5(a)(2) (West 2010)); (3) count III, constructive fraud pursuant to section 6(a) of the IUFTA; (4) count IV, unjust enrichment; and (5) count V, constructive fraud pursuant to section 160/5(a)(1) of the IUFTA (740 ILCS 160/5(a)(1) (West 2010)). The trial court dismissed counts I through IV of plaintiff's complaint and granted summary judgment as to count V thereby disposing of all issues. Plaintiff appealed arguing the trial court erred (i) in dismissing counts II through IV of its complaint; (ii) in granting summary judgment in favor of defendants as to count V; and (iii) in failing to grant plaintiff summary judgment.

¶ 4                              BACKGROUND

¶ 5    Michael A. Prate (Michael) was the sole owner of two companies: Prate Installations, Inc. (Installations, Inc.) which installed gutters, sheet metal, and siding and Prate, Inc. (one of the defendants in this matter), which provided residential and commercial roofing services (collectively "the Companies"). Plaintiff, Zurich American Insurance Company, was Prate, Inc.'s workers compensation insurer. MB Financial Bank, N.A. (MB) is the other defendant in this matter.

¶ 6                 MB Financial Bank, N.A.'s Loan to Michael A. Prate

¶ 7     In mid-2008, Prate, Inc. approached a loan officer at MB about securing a $1,000,000 commercial loan.  However, MB refused to provide a business loan to Prate, Inc. due to its prohibition on accepting new customers who were contractors with year to date operating losses. As evidenced by an internal Prate, Inc. "Business Analysis" prepared by its controller, certified public accountant, Doug Kaeser, Prate, Inc. had not made a profit since 2005 and reported losses between 2006 and 2010 totaling over $5.6 million.

¶ 8     Instead of a business loan to Prate, Inc., on August 25, 2008, MB made a personal revolving line of credit loan to Michael in the original principal amount of $1,000,000 ($1M MB Loan).  Three subsequent notes were executed by Michael extending the maturity date on the $1M MB Loan the last of which was signed on June 15, 2010 with a maturity date of August 15, 2010.  Each of the later three notes specifically preserved the continuing indebtedness of the prior note.  The $1M MB Loan restricted the funds to usage exclusively for the benefit of the Companies.

¶ 9     Contemporaneous with Michael's execution of the $1M MB Loan on August 25, 2008, the Companies each executed Commercial Security Agreements granting MB a security interest in all their assets, then or thereafter arising, and all their proceeds.  (Commercial Security Agreement).  The Commercial Security Agreements executed by the Companies are identical and provide that MB "shall have all rights of a secured party under the Illinois Uniform Commercial Code" and may, among other remedies demand payment from the Companies for any outstanding amounts owed to MB on the loan.  On September 8, 2008, MB perfected its security interest in the Companies by filing UCC Financing Statements with the Illinois Secretary of State.  Prate, Inc. also executed a Commercial Guaranty obligating Prate, Inc. on all amounts due under the $1M MB Loan.

¶ 10 Prate, Inc.'s Obligation to Plaintiff

¶ 11 In 2008, a dispute arose between plaintiff and Prate, Inc. in connection with various insurance agreements and policies Prate, Inc. purchased from plaintiff. On June 1, 2008, Prate, Inc. signed a $701,095 promissory note in favor of plaintiff with payments to begin July 1, 2008. Prate, Inc. did not make any payments due on the note. In attempt to resolve their dispute without litigation, on December 12, 2008, a standstill agreement was put in place between plaintiff and Prate, Inc. suspending each party's pursuit of any claims against the other (Standstill Agreement). As of June 23, 2010, Prate, Inc.'s obligation to plaintiff totaled $1,213,643.12. The Standstill Agreement terminated on or about October 28, 2010. On July 23, 2013, after extensive litigation culminating in an arbitration award, a judgment was entered in favor of plaintiff and against Prate, Inc. in the amount of $1,206,304.18.

¶ 12 Approximately two weeks later, on May 15, 2013, Prate, Inc. stopped operating and entered into an assignment for the benefit of creditors.

¶ 13 Arbitration Award to Installations, Inc.

¶ 14 On September 3, 2008, Installations, Inc. received an arbitration award against Northeast Illinois District Council of Carpenters Union in the amount of $9,434,436 plus reasonable attorney fees (Union Award). Prate, Inc. was not named in the award nor was it a party to the underlying dispute.

¶ 15 Following the issuance of the Union Award on November 14, 2008, MB made a revolving loan to the Companies in the original principal amount of $750,000 ($750K MB Loan) and a promissory note was executed by the Companies. A Pledge and Security Agreement was also executed between MB and Installations, Inc. specifically granting MB a security interest in

the Union Award. The Pledge and Security Agreement prohibited Installations, Inc. from transferring the Union Award without MB's consent.

¶ 16    Additionally, a Cross-Guaranty, Cross-Default, Cross-Guaranty, Cross-Default, Cross-Collateralization and Contribution Agreement (Cross-Collateralization Agreement) was signed by Michael and the Companies in favor of MB. Through the Cross-Collateralization Agreement, the Companies guarantied the $1M Loan, and they also cross-collateralized all their obligations to MB whereby the loan documents and security interests for the $750K MB Loan also secured their guaranties of the $1M MB Loan. On November 18, 20018, MB filed additional UCC Financing Statements with respect to the $750K MB Loan with the Illinois Secretary of State.

¶ 17    After further litigation resulting in a reduction of Installations, Inc.'s Union Award on June 22, 2010, Installation, Inc.'s attorneys wired the balance of the Union Award totaling $5,015,105.30 to Prate, Inc.'s bank account located at MB Financial Bank (MB Bank Account).

¶ 18    The following day, June 23, 2010, Prate, Inc. made two electronic fund transfers to MB: the first, a payment of $752,129.11 in satisfaction of the $750K MB Loan to the Companies (which was not challenged by plaintiff), and the second, a payment of $1,001,222.22 ($1+M Payment) in satisfaction of the $1MM MB Loan to Michael scheduled to mature on August 15, 2010 (and which payment is the subject of this litigation). Following the two payments, MB reduced its security interest on Prate, Inc.'s assets by the full amount of the payments and did not subsequently assert any rights against the funds remaining in Prate, Inc.'s MB Bank Account.

¶ 19    After the two payments cleared, Prate, Inc.'s MB Bank Account had a remaining balance of $3,609,372.78. The bulk of those funds were used to pay off the Companies' liabilities which did not include obligations to plaintiff.

¶ 20                                Trial Court Proceedings

¶ 21    On May 28, 2014, plaintiff filed a complaint against MB and Prate, Inc. (collectively "defendants") seeking to recover the $1+M Payment to MB from Prate, Inc.'s MB Bank Account. On November 13, 2014, plaintiff filed an amended complaint containing four counts as follows: (1) count I alleging the $1+M Payment constituted actual fraud pursuant to section 5(a)(1) of the IUFTA; (2) count II alleging the $1+M Transfer constituted constructive fraud pursuant to section 5(a)(2) of the IUFTA; (3) count III alleging the $1+M Transfer constituted constructive fraud pursuant to section 6(a) of the IUFTA; and (4) count IV alleging unjust enrichment.

¶ 22    On June 15, 2015, the trial court entered an order granting defendants' motion to dismiss plaintiff's amended complaint pursuant to section 2-619(a)(9) of the Illinois Code of Civil Procedure (Code), (735 ILCS 5/2-619(a)(9) (West 2014)). While defendants' motion to dismiss remained pending by before the trial court's June 15, 2015 order, plaintiff sought leave to file a second amended complaint adding a fifth count. Count V, as subsequently amended in plaintiff's fourth amended complaint filed May 25, 2014 (Amended Compliant), alleged the $1+M Transfer constituted constructive fraud pursuant to section 5(a)(1) of the IUFTA. The Amended Complain restated counts I through IV previously dismissed in order to preserve plaintiff's right to appellate review of those issues. The parties filed cross motions for summary judgment as to count V of plaintiff's Amended Complaint. On March 25, 2019, the trial entered an order granting defendants' motion for summary judgment and denying plaintiff's motion for summary judgment.

¶ 23    This appeal followed.

¶ 24                                    ANALYSIS

¶ 25    On appeal plaintiff argues the trial court erred (1) in granting summary judgment in favor of defendants finding the $1+M Payment was not Prate, Inc.'s asset; (2) in denying plaintiff's motion for summary judgment; and (3) in dismissing plaintiff's claims contained in count's II through IV of its Amended Complaint.  Plaintiff does not contest the trial court's dismissal of count I of its Amended Complaint.

¶ 26                              Standard of Review

¶ 27    In this appeal, plaintiff asks this court to review the trial court's denial of plaintiff's request for summary judgment and grant of summary judgment in favor of defendants on count V of its Amended Complaint.  Additionally, plaintiff seeks review of the trial court's dismissal of counts II through IV of its Amended Complaint previously dismissed pursuant to section 2-619(a)(9) of the Code.

¶ 28    "An appeal following a grant of summary judgment, like an appeal from a section 2-619 dismissal, is subject to *de novo* review." *Seymour v. Collins*, 2015 IL 118432, ¶ 42.

¶ 29    With respect to summary judgment, such relief

> "is appropriate when there are no genuine issues of material fact and the moving
> party is entitled to judgment as a matter of law.  [Citation.]  Summary judgment is
> a drastic measure and should only be granted if the movant's right to judgment is
> clear and free from doubt.  [Citation.]  *** On a motion for summary judgment,
> the trial court has a duty to construe the record strictly against the movant and
> liberally in favor of the nonmoving party.  [Citation.]  As a result, summary
> judgment is not appropriate: (1) if "there is a dispute as to a material fact"
> [citation]; (2) if "reasonable persons could draw divergent inferences from the

undisputed material facts" [citation]; or (3) if "reasonable persons could differ on the weight to be given the relevant factors" of a legal standard [citation]." *Id.*

¶ 30    As to a section 2-619 motion to dismiss, the legal sufficiency of the complaint is admitted, but defects, defenses, or other affirmative matters are raised either on the face of the complaint or established through external submissions that defeat the claim. *Krilich v. American Nat. Bank and Trust Co. of Chicago*, 334 Ill. App. 3d 563, 569 (2002). All well pled facts are considered true and dismissal is only appropriate where no facts exists that could entitle the plaintiff to recover. *Senesac v. Employer's Vocational Resources, Inc.*, 324 Ill. App. 3d 380, 385 (2001).

"A section 2–619 proceeding permits a dismissal after the trial court considers issues of law or easily proved issues of fact. [Citation.] Section 2–619(a)(9), in particular, allows dismissal when 'the claim asserted * * * is barred by other affirmative matter avoiding the legal effect of or defeating the claim.' [Citation.] The term 'affirmative matter' as used in section 2–619(a)(9) has been defined as a type of defense that either negates an alleged cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint. [Citation.]

In ruling on a motion to dismiss under section 2–619, the trial court may consider pleadings, depositions, and affidavits. [Citation.] The question on appeal is ' "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." ' [Citation.]." *Krilich*, 334 Ill. App. 3d at 570.

¶ 31 An appellate court may affirm the trial court's grant of summary judgment as well as its dismissal based on certain defects or defenses on any grounds supported by the record irrespective of whether the trial court relied on them. *International Ins. Co. v. Rollprint Packaging Products, Inc.*, 312 Ill. App. 3d 998, 1007 (2000); *Senesac*, 324 Ill. App. 3d at 385.

¶ 32                    $1+M Payment Was Not An Asset of Prate, Inc.

¶ 33 The IUFTA sets out the circumstances under which the transfer of an asset qualifies as fraudulent transfers as follows:

> "§ 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
>
> (b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5 (West 2010).

The Act further states,

"§ 6. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. " 740 ILCS 160/6 (West 2010).

¶ 34    Relevant to our consideration is the Act's definition of "asset" and the resultant limitation of the Act's applicability to only the transfer of an asset or interest in an asset unencumbered by a lien.  Specifically, "asset" is defined by the Act as follows:

"(b) 'Asset' means property of a debtor, but the term does not include:

(1) property to the extent it is encumbered by a valid lien;

(2) property to the extent it is generally exempt under laws of this State; or

(3) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant." 740 ILCS 160/2 (West 2010).

¶ 35    The parties dispute whether Prate, Inc., in effectuating the $1+M Payment, transferred an "asset" of Prate, Inc. as required under the IUFTA for the transfer to be fraudulent.  The trial court in this matter concluded the $1M Payment was not Prate, Inc.'s asset because it belonged to Installation, Inc. and thus there could be no fraudulent transfer under the IUFTA.  We do not address the trial court's determination that the $1+M Payment belonged to Installations, Inc. Instead, we affirm the trial court's decision based on defendants' alternative argument that the $1+M Payment was not an asset as defined by IUFTA because the payment was encumbered by a valid lien.  See *International Ins. Co.*, 312 Ill. App. 3d at 1007 (holding an appellate court may affirm the trial court's grant of summary judgment on any grounds supported by the record).

¶ 36    Our decision here is guided by rules of statutory construction.  The primary rule of statutory construction is to determine the intent of the legislature which is best accomplished by examining the statute's plain language – "the most reliable indicator of legislative objectives of the law." *Pluciennik v. Vandenberg*, 2018 IL App (3d) 160726, ¶ 18.

¶ 37    "The [IUFTA] was enacted to enable a creditor to defeat a debtor's transfer of assets to which a creditor was entitled. *A.G. Cullen Const., Inc. V. Burnham Partners, LLC*, 2015 IL App (1st) 122538, ¶ 26.  Thus, essential to a claim of fraud pursuant to the IUFTA is a "transfer" of "assets."  *Id*.  The IUFTA "limits its application to the fraudulent transfer of 'an asset[.]' " *Pluciennik*, 2018 IL App (3d) 160726, ¶ 17.  As such, where the property that has been transferred does not fall within the preview of the term "asset" as defined by the IUFTA, there can be no fraudulent transfer.  *Id*.  Accordingly, "the threshold question is whether the [$1+M Payment] constituted "an asset" within the meaning of the [IUFTA]."  *Id*.

¶ 38    The IUFTA's defines the term " '[a]sset' [to] mean[] property of the debtor, *but the term does not include (1) property to the extent it is encumbered by a valid lien \*\*\**."  (Emphasis added.)  740 ILCS 160/2(b) (West 2010).  "Valid lien" is defined by the IUFTA to mean "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."  740 ILCS 160/2(m) (West 2010).  The word "lien" is also specifically defined by the IUFTA and "means a charge against or an interest in property to secure a debt or performance of an obligation, *and includes a security interest created by agreem*ent \*\*\*."  (Emphasis added.)  740 ILCS 160/2(h) (West 2010).

¶ 39    Based on the record, we conclude the funds in Prate, Inc.'s MB bank account from which the $1+M Payment was made were encumbered by a "valid lien" as defined by the IUFTA.  Specifically, we find that MB had a security interest in Prate, Inc.'s various assets including its

MB Bank Account from which the $1+M Payment at issue was made.  Accordingly, the funds were not an asset as defined by the IUFTA and could not support a claim of fraud pursuant to the IUFTA.  *Pluciennik*, 2018 IL App (3d) 160726, ¶ 17.

¶ 40    "Article 9 of the [Illinois Uniform Commercial Code (UCC)] governs secured transactions and provides 'a comprehensive scheme for regulation of security interests in personal property and fixtures' " and "[w]ith few exceptions *** applies to 'any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts ***.' "  *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 272 Ill. App. 3d 370, 376 (1995).

¶ 41    Pursuant the UCC a "security interest attaches when it becomes enforceable against the debtor."  *Heartland Bank and Trust v. The Leiter Group*, 2014 IL App (3d) 130498, ¶ 18.  "The security interest is enforceable when (1) it was given for value; (2) the debtor has rights to the collateral; and (3) there is a security agreement describing the collateral."  *Id.*

¶ 42    Commensurate with Michael's execution of the $1M MB Loan on August 25, 2008, a Commercial Security Agreement was executed by Prate, Inc. pledging its assets as security for the $1M MB Loan.  The agreement was signed by Michael, the sole owner of Prate, Inc., and the proceeds from the $1M MB Loan were restricted to use solely for the companies' benefit.  See *id*. at ¶¶ 3, 19, (holding the corporation had rights to its own accounts and other collateral and received value in the form of the use of a line of credit); see also *Midwest Decks, Inc.*, 272 Ill. App. 3d at 376-77 (noting "the [UCC] does not define the term 'rights in the collateral', but it is generally recognized that rights in the collateral may be sufficient if: the debtor has possession and title to the goods [citation] [as well as when] the true owner consents to the debtors' use of

the collateral as security"). The Commercial Security Agreement specifically described MB's rights to the collateral stating that MB would have a security interest in Prate, Inc.'s property including all owned and thereafter acquired accounts, monies, and payments.

¶ 43 All three prerequisites to creating a security interest which attached and was enforceable against the debtor and third parties were met. See *id.* Accordingly, on August 25, 2008, MB's security interest in Prate, Inc.'s collateral attached and was immediately enforceable. Therefore, the funds in Prate, Inc.'s MB Bank Account from which Prate, Inc. made the $1+M Payment constituted property encumbered by a lien specifically "*a security interest created by agreem*ent[.]" See 740 ILCS 160/2(h) (West 2010); see also *Heartland Bank and Trust*, 2014 IL App (3d) 130498, ¶ 18.

¶ 44 We also find that MB's lien was a "valid lien" under the IUFTA because the security interest was an interest in Prate, Inc.'s property "effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." 740 ILCS 160/2(m) (West 2010). We look to the UCC for guidance as to priority of the security interest at issue here as compared to a subsequently obtained judicial lien. See *Nova Chemicals, Inc. v. Frawley*, 2003 WL 22382998, 3-4 (N.D. Ill. Oct. 16, 2003). Generally, "a competing claim to those assets by a secured creditor will take priority over a lien creditor, *provided* the secured creditor has perfected its lien." (Emphasis in original.) *Sign Builders, Inc. v. SVI Themed Const. Solutions, Inc.*, 2015 IL App (1st) 142212, ¶ 16. The same is true in the context of bankruptcy. See *In re Lortz*, 344 B.R. 579, 582-86 (Bankr. C.D. Ill. 2006), (holding a perfected security interest would take priority over a judgment lien under Illinois law and is not subject to avoidance by a trustee in bankruptcy).

¶ 45    Pursuant to the UCC a "security interest in most collateral is perfected by the filing of a financing statement with the Illinois Secretary of State." *Midwest Decks, Inc.*, 272 Ill. App. 3d at 377. Pursuant to section 9-314 of the UCC, a security interest in deposit accounts is perfected when the secured party obtains control of the account which is accomplished under section 9-104 of the UCC when the "secured party is the bank with which the deposit account is maintained. 810 ILCS 5/9-104(a) (West 2008); 810 ILCS 9-314 (West 2008); *Sign Builders, Inc.*, 2015 IL App (1st) 142212, ¶¶ 17-18.

¶ 46    We find that MB had a perfected security interest in Prate, Inc.'s collateral to include its MB Bank Account from which the $1+M Payment at issue was made. As reflected in the record, on September 8, 2008, MB filed with the Illinois Secretary of State a UCC Financing Statement with respect to the security interest in Prate, Inc. Additionally, both parties are agreed that the funds from which the $1+M Payment was made were contained in Prate, Inc.'s MB Bank Account which was at all relevant times maintained by MB. Because MB's perfected security interest in Prate, Inc.'s MB Bank Account would be effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings, MB held a "valid lien" under the IUFTA. 740 ILCS 160/2(m) (West 2008); *Sign Builders, Inc.*, 2015 IL App (1st) 142212, ¶ 16; *In re Lortz*, 344 B.R. at 582-86. This "valid lien" was in place on June 23, 2010 when Prate, Inc. made the $1+M Payment to MB. Thus, we find the funds at issue were subject to a valid lien and therefore not an "asset" of Prate, Inc. that could be the subject of a fraudulent transfer under the IUFTA. On this basis, we affirm the trial court's grant of summary judgment on count V in favor of defendants and against plaintiff.

¶ 47    We note that plaintiff conflates the import of the Commercial Security Agreement executed by Prate, Inc. which attached immediately to the collateral pledged and the Commercial

Guarantee executed by Prate, Inc. which guaranteed the $1M MB Loan such that Prate, Inc.'s obligation was contingent on Michael's default. Plaintiff goes on to argue the contingent liability must be assigned a fair market value which would have to be equivalent to the $1+M Payment to avoid classification as an "asset" under the IUFTA citing a number of federal cases valuing contingent liabilities to determine whether the entity was solvent in the context of a bankruptcy. However, plaintiff's argument ignores the fact that MB had a security interest in MB's collateral to include the MB Bank Account by virtue of the Commercial Security Agreement. As noted above, that security interest attached and became enforceable on August 25, 2008 when the Commercial Security Agreement was executed by Prate, Inc. and MB. See *Heartland Bank and Trust*, 2014 IL App (3d) 130498, ¶ 18. It was not contingent on Michael's failure to pay on the $1M MB Loan or on the loan becoming due. See *id.*; see also *In re Estate of Gallagher*, 383 Ill. App. 3d 901, 903 (2008) (stating "[a] contingent claim is 'one in which liability is dependent upon the uncertain occurrence of a future event, the happening of which is not within the control of either party.' "). Moreover, MB's subsequently perfected security interest had the effect of excluding Prate, Inc.'s collateral to include its MB Bank Account (and the funds therein) from Prate, Inc.'s "assets" as defined by the IUFTA. Thus, no asset was transferred by Prate, Inc. as is essential to a claim of fraud under the IUFTA. See *Pluciennik*, 2018 IL App (3d) 160726, ¶ 17.

¶ 48 Based upon our determination that Prate, Inc. did not transfer an "asset," we need not reach the plaintiff's remaining arguments on appeal with respect to summary judgment and the trial court's dismissal of counts II and III of plaintiff's Amended Complaint all of which are premised on Prate, Inc. having transferred an "asset" which did not occur here.

¶ 49                                     Unjust Enrichment

¶ 50    The only remaining issue is plaintiff's claim for unjust enrichment which the trial court dismissed pursuant to section 2-619(a)(9) the Code, (725 ILCS 5/2-619(a)(9) (West 2014)).

¶ 51    Count IV of plaintiff's Amended Complaint alleged that MB's retention of the $1+M Payment from Prate, Inc. constituted unjust enrichment.  In support of its position, plaintiff argued (1) MB "knew that Prate, Inc. did not have an existing obligation to pay [Michael's $1M MB Loan]"; (2) "knew the transfer was for the benefit of [Michael] who *** was an insider of Prate, Inc.[;]" and (3) "knew that Prate, Inc. had been in poor financial condition with unpaid creditors."  Plaintiff argues that MB therefore "unjustly retained the transfer" of the $1+M Payment and was unjustly enriched where plaintiff claimed that it "as a creditor of Prate, Inc. had a better claim to the funds transferred by Prate, Inc. than MB Financial."

¶ 52    "To state an action for unjust enrichment, 'a plaintiff must allege that the defendant had unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.' " *Philadelphia Indem. Ins. Co. v. Pace Suburban Bus Service*, 2016 IL App (1st) 151659, ¶ 49. "For a cause of action based on a theory of unjust enrichment to exist, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty." *Id*.

¶ 53    Here, we note that plaintiff alleges that it was MB that was unjustly enriched.[1]  The benefit at issue – the $1+M Payment – was received by MB from a third party – Prate, Inc. –

---

[1] Plaintiff is precluded from arguing the same of Prate, Inc. where Prate, Inc.'s obligation to plaintiff was based on an express contract, namely various insurance agreements and contracts as

rather than directly from plaintiff. "Where the benefit was transferred to the defendant by a third party, a claim for unjust enrichment is recognized in the following situations: (1) where the benefit should have been given to the plaintiff, but the third party mistakenly gave it of the defendant instead; (2) where the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) where the plaintiff for some other reason had a better claim to the benefit than the defendant." *National Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 67. The third circumstance is the only possible applicable scenario here as Prate, Inc.'s $1+M Payment to MB was intentionally made to satisfy the $1M MB Loan. Additionally, there are no allegations of wrongful conduct by MB calculated to induce the $1+M Payment it received. Nevertheless, we find the record cannot support plaintiff's claim of unjust enrichment under this third scenario because plaintiff did not have a better claim than MB to the $1+M Payment at issue.

¶ 54      As explained above, MB had a perfected security interest in Prate, Inc.'s MB Bank Account to include the funds comprising the $1+M Payment at issue. The account was specifically identified as collateral for the $1M MB Loan and was ultimately satisfied by Prate, Inc.'s $1+M Payment. That security interest attached on August 25, 2008 when the Commercial Security Agreement was executed and became enforceable against the debtor and third parties.

---

well as a promissory note executed between the parties. See *First Midwest Bank v. Cobo*, 2017 IL App (1st) 170872, ¶ 29, (explaining that "[u]njust enrichment is an equitable remedy based on a contract implied in law" and " 'is inapplicable where an express contract, oral or written, governs the parties' relationship.' ").

See *Midwest Decks, Inc.*, 272 Ill. App. 3d at 376. Thereafter, MB perfected its security interest in the collateral to include Prate, Inc.'s MB Bank Account and the funds therein. MB's perfection of the security interest gave MB priority over any unsecured claim plaintiff had to the funds which, on the date of the payment, were the subject of an ongoing dispute between Prate, Inc. and plaintiff. See *Sign Builders, Inc.*, 2015 IL App (1st) 142212, ¶ 16 (holding that a secured creditor who has perfected its lien will generally take priority over a lien creditor, a judgment creditor who has perfected its lien).

¶ 55    On the date of the June 23, 2010 payment, plaintiff and Prate, Inc. were embroiled in a dispute as to Prate, Inc.'s obligation to plaintiff stemming from various insurance contracts and policies as well as a promissory note in favor of plaintiff on which Prate, Inc. had defaulted. It was not until July 23, 2013, over three years after the payment at issue was made, that plaintiff even obtained a judgment against Prate, Inc. for $1,206,304.18 following arbitration. In fact, on June 23, 2010, Prate, Inc. and plaintiff's Standstill Agreement was in effect precluding Prate, Inc. and plaintiff from perusing their legal claims as they attempted to resolve their respective disputes against each other. Even if MB had a judgment at the time of the June 23, 2010 payment, as noted above, MB's previously perfected security interest in Prate, Inc.'s MB bank account would still take priority over plaintiff's claim. See *id.* Accordingly, plaintiff did not have a better claim to the $1+M Payment.

¶ 56    Furthermore, as set forth in the affidavit Mark Heckler, MB's Executive Vice President, which was attached to MB's summary judgment motion, after the $1+M Payment was made to MB, "[Prate, Inc.] maintained a balance of $3,609,372.78" in its MB Bank Account. We note that this balance was sufficient to cover Prate, Inc.'s obligation to plaintiff which as of June 23, 2010 totaled $1,213,643.12 accordingly to plaintiff. We note that Prate, Inc. thereafter continued

to make payments from its MB Bank Account which were not challenged by plaintiff. Thus, even when MB accepted the $1+M Payment, MB was aware of sufficient funds in Prate, Inc.'s MB account to satisfy Prate, Inc.'s obligation to plaintiff.

¶ 57    Moreover, even if this court accepted that Prate, Inc. was insolvent (an allegation made by plaintiff and disputed by defendants), as the trial court pointed out in its June 15, 2015 order dismissing counts I through IV of plaintiff's Amended Complaint, such circumstances would only serve to justify MB's receipt of the $1+M Payment by Prate, Inc. in satisfaction of the $1M MB Loan. Pursuant to the terms of the Commercial Security Agreement, MB always possessed rights to the collateral including Prate, Inc.'s MB Bank Account. The Commercial Security Agreement states "At any time and even though no Event of Default exists, [MB] may exercise its rights to collect the accounts and to notify account debtors to make payments directly to [MB] for application to the indebtedness." The Security Agreement further provided for events of default including "the insolvency of" Prate, Inc. In the event of such a default due to Prate, Inc.'s insolvency, the Security Agreement granted MB certain rights and remedies including acceleration of the indebtedness and collection of Prate, Inc.'s MB Bank Account and application of the funds therein toward the indebtedness on the $1M MB Loan.

¶ 58    Because of MB's superior perfected security interest in the MB Bank Account and its contractual right to the funds within the account, plaintiff's claim to the $1+M Payment from Prate, Inc. was subordinate to that of MB's and thus there can be no unjust enrichment. See *National Union Fire Ins. Co. of Pittsburgh*, 2015 IL App (1st) 122725, ¶ 67. We therefore conclude count IV of plaintiff's Amended Complaint for unjust enrichment was properly dismissed pursuant to section 2-619 of the Code on the basis that "the claim asserted against

defendant is barred by other affirmative matters avoiding the legal effect of or defeated the claim." 725 ILCS 5/2-619(a)(9) (West 2014).

¶ 59                                 CONCLUSION

¶ 60     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 61     Affirmed.